Bemon G. McBRIDE, Jr., as surviving spouse of Miriam Williamson McBride, Deceased, and Bemon G. McBride, Jr., as Administrator of the Estate of Miriam Williamson McBride, Deceased, Plaintiffs,

v.

GENERAL MOTORS CORPORATION, a Delaware Corporation, Defendant.

Tamara Sue LEHMAN, and Eric Lehman, as surviving spouse of Shoshana Lehman, Deceased, and Eric Lehman, as Executor of the Last Will and Testament of Shoshana Lehman, Deceased, Plaintiffs,

v.

GENERAL MOTORS CORPORATION, a Delaware Corporation, Defendant.

Civ. A. Nos. 89–110–COL, 89–111–COL.

United States District Court,
M.D. Georgia,
Columbus Division.

April 10, 1990.

C. Neal Pope of Pope, Kellogg, McGlamry, Kilpatrick & Morrison, and John W. Denney of Kelly, Denney, Pease & Allison, Columbus, Ga., for plaintiffs in Civ. A. No. 89–110–COL.

James E. Humes, II of Hatcher, Stubbs, Land, Hollis & Rothschild, Columbus, Ga., Larry B. Bridgers of King & Spalding, Atlanta, Ga., and Thom Rumberger of Rumberger, Kirk, Caldwell, Cabaniss, Burke & Wechsler, Orlando, Fla., for defendant.

C. Neal Pope of Pope, Kellogg, McGlamry, Kilpatrick & Morrison, Columbus, Ga., and Robert T. Goldenberg of Goldenberg, Goldenberg & Stealey, Parkersburg, W.Va., for plaintiffs in Civ. A. No. 89–111–COL.

Eddie Snelling, Jr., Asst. Atty. Gen., for the State of Georgia.

## OPINION AND DECLARATORY JUDGMENT

ELLIOTT, District Judge.

For decision, in this case of first impression, is the constitutionality of certain sections of the Georgia Tort Reform Act of 1987 (Tort Reform Act, or Act), and in particular O.C.G.A. §§ 51–12–5.1(e)(1) and 51–12–5.1(e)(2), as enacted in Section 5 of said Act, effective July 1, 1987.[1]

By verified complaints in the above actions the Plaintiffs seek recovery of damages against the Defendant General Motors Corporation (GM) for personal injuries, property damages, and wrongful death, together with punitive damages with respect to all claims other than the wrongful death claims, as well as class certification of a mandatory class with respect to the punitive damage claims and a mandatory class with respect to the property damage claims. The two actions have been consolidated for all purposes except trial.

Plaintiffs seek a declaratory judgment as to the constitutionality of the above referenced sections of the Tort Reform Act inasmuch as their individual and class punitive damages claims are directly affected by those sections of the Act.

---

1. Attached as Appendix "A" is a copy of the Georgia Tort Reform Act of 1987.

Recognizing that the constitutional challenges should receive initial consideration, the parties' counsel so stipulated, and were present at a noticed hearing on Defendant GM's motion for a scheduling order. The State of Georgia was represented at the hearing by an Assistant Attorney General of the State. The Court, by a scheduling order of November 29, 1989, set a scheduling procedure whereby initial consideration would be given to the constitutional challenges as requested by the parties.

At the scheduling hearing the Court was assured by the State of Georgia, through its representative, that these constitutional challenges are the first and only such challenges now pending in any state or federal court of this state. The State, through the Assistant Attorney General, requested and the Court granted permission to the State to respond to the constitutional challenges.

The challenged sections of the statute are here underlined and provide as follows:

51–12–5.1. Punitive Damages

(e)(1) In a tort case in which the cause of action arises from product liability, there shall be no limitation regarding the amount which may be awarded as punitive damages. *Only one award of punitive damages may be recovered in a court in this state from a defendant for any act or omission if the cause of action arises from product liability, regardless of the number of causes of action which may arise from such act or omission.*

*(2) Seventy-five percent of any amounts awarded under this subsection as punitive damages, less a proportionate part of the costs of litigation, including reasonable attorney's fees, all as determined by the trial judge, shall be paid into the treasury of the state through the Fiscal Division of the Department of Administrative Services. Upon issuance of judgment in such a case, the state shall have all rights due a judgment creditor until such judgment is satisfied and shall stand on equal footing with the plaintiff of the original case in securing a recovery after payment to the plaintiff of damages awarded other than as punitive damages. A judgment debtor may remit the state's proportional share of punitive damages to the clerk of the court in which the judgment was rendered. It shall be the duty of the clerk to pay over such amounts to the Fiscal Division of the Department of Administrative Services within 60 days of receipt from the judgment debtor. This paragraph shall not be construed as making the state a party at interest and the sole right of the state is to the proceeds as provided in this paragraph.*

Plaintiffs, in their respective complaints (McBride—paras. 33 and 34; Lehman—paras. 35 and 36), set forth the constitutional challenges. Defendant GM has answered and denied every contention set forth by Plaintiffs and specifically denied that O.C.G.A. § 51–12–5.1(e) is unconstitutional.

Plaintiffs, in their motion for this Court to issue a declaratory judgment declaring the above sections unconstitutional, set forth again the grounds of challenge and filed a brief in support. Defendant GM and the State of Georgia have responded to the Plaintiffs' motion and seek a judgment of the Court declaring that the challenged sections are constitutional. The Plaintiffs have filed their reply brief to the responses of GM and the State.

The parties' respective positions are well defined and adversarial in a case of actual controversy within the jurisdiction of this Court and the Plaintiffs' constitutional challenges are now ripe for decision.

The cases here involved arise out of injuries received by rear-seat occupants of motor vehicles manufactured, sold, and distributed by Defendant GM. The *McBride* case involves the personal injury and death of McBride's wife on March 16, 1989, while a rear-seat occupant in a 1986 Oldsmobile 98. The McBrides were Columbus, Muscogee County, Georgia, residents and the collision there involved occurred in said county, within this judicial district (McBride complaint).

The *Lehman* action involves the personal injury and death of the rear-seat occupant of a 1988 Oldsmobile Cutlass Sierra, manu-

factured, sold, and distributed by Defendant GM, as well as the personal injury of another rear-seat occupant, arising out of a collision which occurred on June 18, 1989, in Georgia, within this judicial district. The Plaintiff suffering personal injuries only was a resident of Atlanta, Georgia. The other rear-seat occupant, who received personal injuries and subsequently died, was a resident of West Virginia, as is her husband, the Plaintiff suing to recover damages for personal injuries and wrongful death. (Lehman complaint)

The *McBride* action and *Lehman* action arise from product liability, the Plaintiffs contending that each vehicle contained a defective rear-seat lap belt only occupant restraint component system[2] and that all of the injuries and damages suffered by the Plaintiffs were caused by the defective lap belt only seat belt assemblies in the rear seats of Defendant GM automobiles.

The Plaintiffs allege willful, wanton and intentional acts on the part of Defendant GM such as to warrant the imposition of punitive damages, in addition to compensatory damages.

Plaintiffs also seek certification of a mandatory class of punitive damage claimants sustaining personal injuries and/or property damages in Georgia as a result of rear-seat lap belt only occupant restraint systems of Defendant GM's motor vehicles.

Defendant GM is a Delaware corporation with its principal place of business in Detroit, Michigan, as appears from the Plaintiffs' complaints and the Defendant's answers, and Defendant GM has admitted that jurisdiction and venue are proper in this court as to the individual claims of the named Plaintiffs. (McBride complaint, para. 9, GM answer, para. 9; Lehman complaint, para. 10, GM answer, para. 10).

In view of the importance of the state law here involved and, in particular, a constitutional challenge to the Tort Reform Act in a case of first impression, the Court has carefully considered the briefs and documents submitted to it in an effort to perceive how the Georgia Supreme Court would rule with regard to the state constitutional questions presented. As to the federal constitutional claims, the Court will apply federal law.

The state constitutional claims are properly before the Court inasmuch as the Court has jurisdiction over substantial federal constitutional claims derived from a common nucleus of operative fact. Moreover, as these actions would have been removable by the Defendant GM had the Plaintiffs commenced suit in a Georgia state court, and in view of the fact that neither the parties nor the State have given any indication that this Court should abstain from ruling on the state constitutional challenges here made, and in view of the State's assurance that there are no cases pending in the state courts of Georgia wherein this statute has been challenged on state or federal constitutional grounds, the Court will proceed to render its opinion and judgment on the issues presented.

At the outset it must be noted that the Plaintiffs do not seek to have this Court declare the entire Tort Reform Act unconstitutional. The Plaintiffs' challenges are focused on the punitive damage section of the statute and in particular the subsection dealing with product liability punitive damage claims.

Plaintiffs' challenges go to the one-award feature of the new Act with respect to product liability punitive damage claims and to the legislative determination that the State of Georgia shall have the status of a non-party at interest judgment creditor of equal standing with the Plaintiff in the original case with respect to 75% of any punitive damage award rendered in a product liability action.

The Plaintiffs' constitutional challenges can be generally grouped as follows:

(1) Plaintiffs challenge the one-award provision on due process and equal protection grounds under both the state and federal constitutions, the right to a jury trial under both the state and federal constitutions and as a special law or grant of

---

**2.** As distinguished from a rear-seat lap shoulder    restraint.

special privileges or immunities prohibited by the state constitution.

(2) They challenge the judgment creditor status of the State as to 75% of a product liability punitive damage award under the due process and equal protection provisions of the state and federal constitutions, and under the excessive fines provision of the state and federal constitutions, and under the state constitutional provision providing that no bill shall pass which refers to more than one subject matter or contains matter different from what is expressed in the title thereof and under the separation of powers provision of the state constitution.

Thus the constitutional provisions here involved are the 7th, 8th, and 14th Amendments to the Constitution of the United States and Art. I, Sec. I, Par. I (due process), Art. I, Sec. I, Par. II (equal protection), Art. I, Sec. I, Par. XI (jury trial), Art. I, Sec. I, Par. XII (right to courts), Art. I, Sec. I, Par. XVII (excessive fines), Art. I, Sec. II, Par. III (separation of powers), Art. III, Sec. VI, Par. IV (special legislation), Art. III, Sec. V, Par. III (one subject matter expressed), and Art. I, Sec. I, Par. X (no irrevocable grant of special privileges or immunities) of the Georgia Constitution.

Plaintiffs have also urged that Art. I, Sec. II, Par. V, of the Georgia Constitution, providing that legislative acts in violation of the Georgia Constitution or the Constitution of the United States are void and the judiciary shall so declare them, places upon the judiciary a duty to declare such acts invalid such that no claim can be based upon an act of the legislature which contravenes the state or federal constitution.

The Plaintiffs attack the Act as being unconstitutional on its face. In its response Defendant GM alleges that the purpose of the Tort Reform Act was to address the crisis in liability insurance costs and availability and to provide a rational structure for tort liability; that the Act was the product of detailed study and debate, and incorporated many recommendations of an advisory committee appointed by the Governor to investigate the liability insurance crisis in Georgia; and attached a copy of the Report of The Governor's Advisory Committee on Tort Reform of December 15, 1986. The Court has reviewed the Report in detail. Among items approved by the Committee for action, but without unanimity, and the only matter dealing with punitive damages, is paragraph 25 at page 6 of the Report providing as follows:

25. Punitive damages—would be capped at $350,000.00, provided that the cap would not apply in cases of intentional acts and provided further that only one punitive damage award could be made for the same act or omission.

The Report points out the divergent views expressed in presentations to the Committee, some contending that there was and some contending that there was not an insurance crisis in Georgia or elsewhere, and the Report states at page 11: "Excerpts from an assortment of presentation by entities one would reasonably believe to be authoritative further emphasize the difficulty in determining whether or not there is in fact a crisis."

The Report reflects the conclusions of Professor Thomas Eaton, of the University of Georgia School of Law, at page 12, that:

"The data does not suggest that irresponsible juries are responsible for the high cost of or limited availability of liability insurance. Jury verdicts in the vast majority of cases are moderate. The large verdicts reflect great injuries. Punitive damages are not awarded with great frequency and do not appear to be excessive in amount given the nature of the wrongful conduct and extent of the compensatory damages. The tort reform study should not focus on alleged jury irresponsibility, but on whether we can afford the system of civil justice that we have had in the past (or whether we can afford not to have it)."

The Report states, at page 14, that:

David Clark, who heads up the rate regulatory function of the State Insurance Commissioner's Office, testified that his department did not have the data available to determine if there was an insurance liability crisis in Georgia.

At least one major carrier, Aetna Casualty and Surety Company, in response to an inquiry from the State of Florida Insurance Commissioner's Office as to the impact .of recently adopted tort reform measures in that state concluded that the same would have no significant impact on liability insurance premium rates in Florida.

While by no means an exhaustive summary of the conflicting presentations and materials submitted to the Committee, certainly the reader can readily understand the difficulty in reaching any categorical resolution of the questions under consideration.

In its response the State of Georgia provided the Court with no documents or studies whatsoever, but advised the Court that:

The state interest in question is the viability of Georgia businesses continuing their operation and continuing to bring income to the State of Georgia even though the business may have erred in one of its products....

The Act rationally furthers another governmental interest of generating revenue. Not only will revenue come directly from 75 percent of the award for punitive damages authorized under O.C.G.A. § 51–12–5.1(e)(2), but by limiting the amount of punitive damages in product liability cases to one award [O.C.G.A. § 51–12–5.1(e)(1)], the financial viability of the manufacturer is much more likely and, hence, further revenue is generated to the state through the continuing operation of the manufacturer.

(State's Brief, p. 3)

The Act furthers another important governmental interest in punishing a manufacturer only one time for any act or omission....

(State's Brief, p. 4)

... The legislative goal is to facilitate business operations in Georgia by limiting tort liability to one award of punitive damages for a maximum of $250,-000.00....

(State's Brief, p. 7)

In reply to the responses of Defendant GM and the State, the Plaintiffs attached documents for the Court's review. Exhibit 1 is a copy of an article from *The Atlanta Constitution* of October 21, 1986, concerning Professor Eaton's study, reporting that he found that punitive damages were awarded in only 7 out of only 27 Fulton County cases seeking punitive damages; that the three largest awards were $1.2 million, $300,000.00 and $100,000.00, while the three smallest punitive damages awards were for less than $15,000.00. The article reported that Professor Eaton said in his interview that he was surprised that he did not find more punitive damages.

The Plaintiffs also called the Court's attention to the following: "Insurance Antitrust Case Important to All Citizens," 22 Texas Trial Lawyers Forum No. 3 (1988); Statement of Ralph Nader before the Subcommittee on Commerce, Transportation and Tourism of the Committee on Energy and Commerce, U.S. House of Representatives, Topic: "The Great Insurance Industry Boycott of 1985," dated September 19, 1985; Testimony of J. Robert Hunter, President, National Insurance Consumer Organization, before the Insurance Committee of Pennsylvania House of Representatives, dated November 7, 1985; and "An Analysis of the Causes of the Current Crisis of Unavailability and Unaffordability of Liability Insurance" 1–2 (NAAG 1986). (Plaintiffs' Reply Brief, pp. 8, 9, Exhibits 2, 3, 4 and 5).

The Court was privileged to serve for a number of years in the legislative branch of the state government of Georgia, and now, as a member of the judicial branch of the federal government, is especially mindful of the separation of the powers, functions, and responsibilities of these offices. With this background the Court has examined the Tort Reform Act, including its caption and its subject matter, and first observes that there is no legislative purpose or finding set forth in the Act, other than the statement "To provide substantive and comprehensive civil justice reforms affecting tort claims litigation; ..."

After full review of the pleadings, motion, briefs, responses, replies and documents and after considering the argu-

ments advanced by the respective parties, including the State of Georgia, the Court finds initially that the one-award provision of O.C.G.A. § 51–12–5.1(e)(1) on its face discriminates between plaintiffs having claims for punitive damages arising out of product liability actions, inasmuch as that provision would limit an award of punitive damages in product liability actions to the first plaintiff able to win the race to the courthouse and secure an award. The Court further finds initially that the one-award section on its face discriminates between product liability punitive damage claimants who are limited to only one award of punitive damages in product liability cases and plaintiffs in tort cases other than product liability cases who are not limited to one award of punitive damages in those tort cases.

The Court further finds initially that O.C.G.A. § 51–12–5.1(e)(2) on its face arbitrarily discriminates between product liability punitive damage plaintiffs who secure an award of punitive damages and may under the statute retain only 25% of such an award and punitive damage tort plaintiffs in cases other than product liability actions who may retain 100% of any award of punitive damages.

The Court further finds initially that O.C.G.A. § 51–12–5.1(e)(2) granting the State the status of a non-party at interest judgment creditor as to 75% of any product liability punitive damages award on its face is matter different from what is expressed in the title of the Tort Reform Act, that the Act purports to amend Title 51 of the Official Code of Georgia Annotated relating to torts and that the subject matter of § 51–12–5.1(e)(2) is matter other than that relating to torts. Thus § 51–12–5.1(e)(2) violates Art. III, Sec. V, Par. III of the Georgia Constitution. *See Nelson v. Southern Guaranty Ins. Co.,* 221 Ga. 804, 147 S.E.2d 424 (1966).

The Court further finds that neither the Report of the Governor's Advisory Committee on Tort Reform, Exhibit A to Defendant GM's brief, nor Exhibits 1, 2, 3, 4, and 5 to the Plaintiffs' reply brief, are persuasive as to whether the Tort Reform Act

of 1987 was enacted to address a crisis in liability insurance costs and availability inasmuch as the documents produced do not reveal that any such determination was made or was not made. Moreover, the State of Georgia has presented no studies or documentation to that effect nor has the State taken any position with reference thereto. Thus, the Court will consider the constitutional questions relying upon the State of Georgia's advice to this Court that the legislative goal of the Tort Reform Act was to *facilitate business operations in Georgia.*

The Court will not accept the advice of the State that the General Assembly has deemed that the maximum punishment for a business for any one act or omission shall be $250,000.00 and that by limiting only one punitive damage award to $250,000.00 the State has ensured that the offending business will not be punished repeatedly for the same offense or error. The Court will not accept this advice because the Tort Reform Act has no such provision therein. The State in its briefing has evidently misconstrued the Act or overlooked the fact that a manufacturer of products is by the Act protected against more than one award of punitive damages, but that award is in an unlimited amount. The only cap contained in the Act is a cap of $250,000.00 on punitive damages other than product liability punitive damages and wherein the offending tort-feasor is found not to have acted, or failed to act, with the specific intent to cause harm. If it is found that the tort-feasor acted, or failed to act, with the specific intent to cause harm, then there is no limitation on the amount which may be awarded by the jury as punitive damages. Moreover, there is no limitation on the number of punitive damage awards that may be rendered against a non-product liability tort-feasor. *See* O.C.G.A. § 51–12–5.1(e), (f), and (g).

The Court will likewise give no credence to the State's advice that the Tort Reform Act furthers a governmental interest of generating revenue from the 75% of the award for punitive damages authorized under O.C.G.A. § 51–12–5.1(e)(2) inasmuch as the Act is an amendatory act, specifically

amending Title 51 of the Official Code of Georgia Annotated relating *only to torts.* The purpose of the amendatory act must be related to the amendatory act as a whole, and not one isolated section. Revenue for the State is a separate subject matter, merely incidental, contained in one isolated subsection, and cannot serve as a purpose for the legislative scheme of the amendatory act as a whole. Moreover, there could be no rational basis for discriminating between punitive damages claimants, product liability or non-product liability, if the purpose is to generate revenue. All such punitive awards under such an analysis would be subject to the assessment of 75%, or else such a classification is arbitrary and unreasonable, for no fair and substantial relationship exists upon which to base such a distinction, and the differentiation bears no real relationship to the object or purposes of the legislation, if the purpose is to raise revenue. This provision is a thinly disguised arbitrary restraint in favor of business seeking to deter punitive damage actions against egregious business practices by reducing incentives for injured plaintiffs to take action to punish and deter such practices.

The problem with the product liability punitive damage one-award concept of the Tort Reform Act is that there can be no construction of that section so that the award rendered against the tort-feasor must be a meaningful and substantial award, commensurate with the wrongdoing committed by a product manufacturer. The award under the statute could be as little as $50.00. The flaw is that this statute has no rational relationship to an award sufficient to penalize, punish, or deter any business from a course of harmful conduct, particularly in a multi-tort or mass-tort setting, where history has demonstrated that the extent and magnitude of the wrongdoing is seldom if ever determined in an initial instance. Only after repeated actions and continued discovery does the full extent of the injury and damage caused by the wrongdoing become known and its offensive character recognized, such that a meaningful, substantial, and deterring award can be expected. Examples are the asbestos litigation and the Dalkon Shield litigation.

Thus, under the product liability punitive damage provisions here involved, a manufacturer could place in the stream of commerce in Georgia an unlimited number of vehicles having defective brakes. An early award of $500.00 in punitive damages arising out of a property damage and/or personal injury incident wherein a person's automobile suffers a slight "fender-bender" because of defective brakes insulates that manufacturer from any real, substantial, and meaningful punitive damage award as to any number of its other vehicles having defective brakes causing serious personal injuries, especially if that manufacturer fails to repair, recall, or adequately warn of the unreasonably hazardous defective products.

Were the one-award concept of product liability punitive damages couched in some form of substantial and meaningful amount, to some extent proportional to the wrongdoing committed by a product manufacturer, the concept might be rational, inasmuch as due process may place a limit on the number of times and the extent to which a defendant may be subjected to punishment for a single course of conduct. The Georgia statute does not serve a rational legislative purpose of affording damages of a substantial and meaningful amount to some extent proportional to the wrongdoing committed so as to penalize, punish, and deter the product liability wrongdoer as is required by O.C.G.A. § 51–12–5.1(a), (c), and (d)(2).

This flaw in the statute is further exposed in the argument of Defendant GM in its brief at page 16, where the Defendant argues:

> ... Additionally, the state has an interest in assuring that the penalty it imposes through punitive damages is to some extent proportional to the wrongdoing committed by a product manufacturer.
>
> The limit of one award of punitive damages per act or omission by a product manufacturer is rationally related to furthering these state interests. Under this provision, the state *continues to*

*punish and deter* the product manufacturer, while at the same time it insures that the product manufacturer is not excessively punished through repeated, *large awards* of punitive damages.... (Emphasis supplied.)

The Court further initially finds that the one-award section of the statute is too vague, uncertain, and indefinite to be enforced in that the statute purports to limit to one award for any act or omission if the cause of action arises from product liability, regardless of the number of causes of action which may arise from such "act or omission"; and thus is not definite as to what constitutes an act or omission, is not definite as to whether the one award would apply no matter how many lines of products a particular defendant may manufacture, or whether a defendant may be liable as to each individual line of products a particular defendant may manufacture, or whether a defendant may be liable as to each product it may manufacturer, or whether if two or more persons are injured at the same time by the same defective product and under the same circumstances, one or more or all may each recover one award, or whether only one may recover an award or whether all must share in one award.

Defendant GM argues that the concept of an "act or omission" is not so vague as to render the statute unenforceable and that the concept clearly intends that the same defect in the same basic product will only result in one award of punitive damages. However, the statute makes no reference whatsoever to "basic" products nor does it define an "act or omission." Defendant GM recognizes this deficiency for it argues in its brief at page 17 that:

... Even if this provision could be subject to differing interpretations within a range of possibilities, the mere fact that a court must engage in statutory construction does not render the entire Act unconstitutional, as plaintiffs claim.

However, it is the Court's opinion that the Court would be unable to construe the statute when the Court must guess at its meaning without any reasonable assurance of ever reaching a consistent, workable and rational interpretation. *See City of Atlanta v. Southern Railway Co.*, 213 Ga. 736, 101 S.E.2d 707 (1958). It could as well be argued that more than one act or omission is involved in a course of egregious conduct extended over many years and involving more than one line of products, if a manufacturer were to continue selling products containing the same defect of a hazardous or injury-producing potential, unreasonably dangerous to users. The provision for one award for any act or omission fails to resolve the uncertainty, vagueness, and indefiniteness associated with continuous or repeated torts. The statute does not address the situation where a defendant is assessed punitive damages for one act or omission and later fails to rectify the harm or risk through recall, repair, or warning. The statute can be read such that in that situation the defendant would no longer be exposed to punitive damages in Georgia.

The Court now turns to decisions involving the constitutionality of state statutes, the nature of the rights asserted by those challenging such statutes and the analysis used by the courts in testing the constitutionality of those statutes.

In *Jenkins v. Manry*, 216 Ga. 538, 118 S.E.2d 91 (1961), the Supreme Court of Georgia reviewed a judgment of the lower court sustaining a demurrer and dismissing an action for a declaratory judgment. The Court reversed that judgment and held that discriminatory provisions contained in a statute relating to licensing of plumbers and steam-fitters rendered the statute unconstitutional and void. The Court held:

... The purpose of the Declaratory Judgments Act is to "settle and afford relief from uncertainty and insecurity with the respect to rights, status and other legal relations * * *." Ga.L.1945, pp. 137, 139 (Code, Ann., § 110–1111). An action for declaratory judgment is available to test the validity of an alleged unconstitutional law, in order that a person desiring to practice his vocation may known whether he may proceed in disregard of the requirements of the law, or whether he must refuse to accept employment regu-

lated by law until he can comply with its provisions. (at pp. 93, 94)

The provisions of § 12 are discriminatory against individuals not connected with a partnership or corporation, since the individual would not be allowed to engage in the plumbing or steam-fitting business without obtaining the certificate provided for by the act, whereas a partnership or corporation would have the right to engage in either of such businesses if one person holding such a certificate is connected with the partnership or corporation, whether or not that person is supervising the plumbing or steam-fitting work done.... (at p. 96)

There is no reasonable basis for requiring the examination and licensing of plumbers and steam fitters who are not employees of public-utility corporations, and exempting employees of public-utility corporations operating in the territory covered by the act. This is an unjust discrimination between classes of persons, since the actions of one class in following the vocation of plumbing or steam fitting would affect the public health as materially as the actions of the other class. (at pp. 96, 97)

118 S.E.2d 91.

In *Shessel v. Stroup*, 253 Ga. 56, 316 S.E.2d 155 (1984), the plaintiff and her husband brought a malpractice action against a doctor. The doctor contended that the action was barred by a two year statute of limitations enacted as a part of an Act entitled "Limitations of Actions for Medical Malpractice," Ga.L.1976, p. 1363, *et seq.*, O.C.G.A. § 9–3–71. The lower court held the statute unconstitutional and the Georgia Supreme Court affirmed. The Court held:

Now we have at hand a case in which there is an alleged negligent act constituting medical malpractice in which the negligence produced no injury until more than two years after the alleged negligence occurred. Just as a wrongful death action may not be brought until death occurs, a personal injury claim may not be brought until there is injury. OCGA § 51–1–8; *Jankowski v. Taylor, Bishop & Lee*, 246 Ga. 804 (273 S.E.2d

16) (1980). Therefore, we have the same arbitrary three-way classification held unconstitutional in *Clark v. Singer*, supra. The general tort limitation begins only when the action "accrues" and that is no sooner than the date of injury and perhaps no sooner than the date of discovery. OCGA § 9–3–33. But, the medical malpractice statute begins to run from the date of negligence, thereby classifying cases into one category where injury occurs within the two-year period and another where injury occurs after the two-year period. OCGA § 9–3–71. All general tort claims survive until there is injury, some medical malpractice claims survive until there is injury and some medical malpractice claims do not. As was pointed out in *Clark v. Singer*, supra [250 Ga. 470] at 472 [298 S.E.2d 484 (1983)], "Statutes of limitation ... are designed to promote justice by preventing surprises through the revival of claims that have been allowed slumber until evidence has been lost, memories have faded, and witnesses have disappeared." We find no substantial relation in this three-way classification to the object of a limitation statute. All who are similarly situated are not treated alike. We hold that OCGA § 9–3–71 is a denial of equal protection and therefore unconstitutional as applied to personal injury claims in which injury occurs more than two years after the negligent or wrongful act or omission occurs.

253 Ga. 56, 58–59, 316 S.E.2d 155.

In *Jones v. Jones*, 259 Ga. 49, 376 S.E.2d 674 (1989), the Georgia Supreme Court held that the interspousal immunity doctrine contained in O.C.G.A. § 19–3–8 was unconstitutional. In that case the Court held:

... We hold that the application of the interspousal immunity doctrine to wrongful death actions violates the constitutional guarantee of equal protection and therefore reverse.

In determining whether the classification created by the statute is constitutional as applied to wrongful death actions, we apply the rational basis test. *Clark v. Singer*, 250 Ga. 470, 298 S.E.2d

484 (1983). The classification must be rationally related to some legitimate state purpose; it must " 'rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. *Reed v. Reed,* 404 U.S. 71, 76 (92 SC 251, (254) 30 LE2d 225) (1971); *Bickford v. Nolen,* 240 Ga. 255, 256 (240 SE2d 24) (1977).' " Id. 250 Ga. at 472, 298 SE2d 484, quoting *Allrid v. Emory University,* 249 Ga. 35, 285 S.E.2d 521 (1982).

There are two policy considerations that are traditionally advanced as the object of the interspousal immunity doctrine: (1) to foster marital harmony by preventing suits between spouses; and (2) to avoid fraudulent or collusive lawsuits. *Robeson v. International Indemnity Company,* 248 Ga. 306, 282 S.E.2d 896 (1981). In the context of a wrongful death action, neither of these justifications for the doctrine adhere. First, and most obviously, there can be no marital harmony to foster when one spouse has died. Second, the deceased spouse cannot conspire or collude with the defendant spouse....

In sum, we conclude that the interspousal immunity doctrine arbitrarily distinguishes between classes of wrongful death claimants. We therefore hold that OCGA § 19–3–8 is unconstitutional as applied to actions for wrongful death.

376 S.E.2d 674, 675–676.

As its first line of defense Defendant GM has contended that the Plaintiffs do not have standing to challenge the constitutionality of the punitive damages provisions of the Tort Reform Act because they have "no vested right to punitive damages," citing *Kelly v. Hall,* 191 Ga. 470, 12 S.E.2d 881 (1941), for the proposition that there is no vested right in any claim of damages, compensatory or punitive, arising out of a tort, until a judgment is entered. In *Kelly* it is stated that "it is the general rule that until a judgment is entered there is no vested right in a claim for damages for a tort which is not connected with or does not grow out of a contractual relation." Under GM's argument, there could

never be a constitutional challenge to legislation affecting tort recovery by a tort victim in Georgia.

The Georgia law is clearly contrary to Defendant GM's contention. In neither the *Shessel v. Stroup* case nor the *Jones v. Jones* case did any plaintiff have a vested property right or vested interest. They had not reduced any claims to judgment. Yet, without question, the Georgia Supreme Court considered the constitutional challenges of those parties and declared the statutes unconstitutional. The malpractice victim in *Shessel* and the wrongful death claimant in *Jones* were seeking to recover for torts and were challenging the constitutionality of statutes affecting that right. The right is set forth in O.C.G.A. § 51–1–9 which provides: "Every person may recover for torts committed to himself, his wife, his child, his ward, or his servant." This section is merely declaratory of the common law in Georgia.

Georgia also has a rich history of availability of punitive damages at common law. Punitive or exemplary damages were allowed as part of the common law notwithstanding the absence of any specific legislative basis. *See Kendrick v. McCrary,* 11 Ga. 603 (1852), wherein the actual damage proved by plaintiff at trial was only $49.00 and the jury returned a verdict for $1,049.00, giving $1,000.00 vindictive damages, affirmed on appeal.

Prior to the enactment of the Tort Reform Act, then O.C.G.A. § 51–12–5 provided that: "In a tort action in which there are aggravating circumstances, in either the act or the intention, the jury may give additional damages to deter the wrongdoer from repeating the trespass or as compensation for the wounded feelings of the plaintiff." This section has appeared in the Georgia Codes from at least 1863 through the Code of Georgia of 1981, until the enactment of the Tort Reform Act of 1987.

The most recent case decided by the Supreme Court of Georgia under the prior Code is *Hospital Authority of Gwinnett County v. Jones,* 259 Ga. 759, 386 S.E.2d 120 (1989) (appln. for cert. pending to U.S.

Supreme Court). In that case the Court held that the right to punitive damages derives from the common law. The Court had to decide whether punitive damages were constitutional under the excessive fines, equal protection and due process clauses of the Georgia and federal constitutions. The Court sustained the statute on all grounds and affirmed the punitive damage award in that case.

In *Browning-Ferris Industries v. Kelco Disposal, Inc.*, —— U.S. ——, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), the Court decided that the Eighth Amendment's excessive fines clause was not applicable to punitive damage awards between private parties and, in upholding a punitive damage award under Vermont law, held:

> ... This aspect of our Eighth Amendment jurisprudence might have some force here were punitive damages a strictly modern creation, without solid grounding in pre-Revolutionary days. But the practice of awarding damages far in excess of actual compensation for quantifiable injuries was well recognized at the time the Framers produced the Eighth Amendment. Awards of double or treble damages authorized by statute date back to the 13th century, see Statute of Gloucester, 1278, 6 Edw. I, ch. 5, 1 Stat. at Large 66 (treble damages for waste); see also 2 Pollock & Maitland, at 522, and the doctrine was expressly recognized in cases as early as 1763.
> . . . .
> Review of the District Court's order involves questions of both state and federal law. In a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law.[24] Federal law, however, will control on those issues involving the proper review of the jury award by a federal district court and court of appeals....

The decision in *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) focused on the differences between compensatory and punitive damages awards and the Court held that, although a statute authorized the imposition of civil penalties when federal standards had been violated, there nevertheless could also be an award for state-imposed punitive damages for the same incident, commenting that adequate remedies for persons injured have included both compensatory and punitive damages throughout the history of the common law.

This Court does not perceive that the Georgia Supreme Court would uphold those portions of the Tort Reform Act which so arbitrarily and discriminatorily deprive a tort victim of the right to recover an element of damages which has been so long and so universally recognized.

Both the State and GM suggest, however, that there would be precedent for such a ruling, citing *Teasley v. Mathis*, 243 Ga. 561, 255 S.E.2d 57 (1979). It is the Court's view that reliance on *Teasley* is unfounded. *Teasley* dealt with the Georgia Motor Vehicle Reparations Act (hereinafter "No-Fault Act") in which plaintiffs were clearly presented the elements of a *quid pro quo* that do not exist in relation to the Tort Reform Act product liability punitive damage provisions. This is illustrated by the subsequent case of *Lawson v. State Farm Mutual Automobile Insurance Co.*, 256 Ga. 285, 347 S.E.2d 565 (1986) dealing with the same No-Fault Act.

In *Teasley*, the Court upheld the No-Fault Act preclusion of a claim for punitive damages for causes of action in which no "serious injury" had occurred. The Court found a rational relationship as to the elimination of that element of damages, that being to assure that collateral litigation over no-fault payments would be rare and that prompt payments would be made when due. The obvious *quid pro quo* of the *Teasley* decision was the elimination of the element of fault and a rapid or prompt payment of no-fault claims in return for a "serious injury" threshold. This No-Fault Act was enacted in order to establish a

---

24. The law of punitive damages in Vermont is typical of the law in most American jurisdictions. The doctrine has long standing....

mandatory insurance system, and in that system, if no "serious injury" was proven, the claimant was not entitled to a claim of noneconomic damages, whether the claim be for compensatory or punitive damages.

In the later *Lawson* case the insurer was sued for punitive damages for failure to pay the claims for personal injury protection benefits within the statutorily required No–Fault Act time period. In that case the Supreme Court held that an action to recover benefits is not a prerequisite to maintaining an action for penalties or punitive damages under the No–Fault Act allowing for such recovery for the insurer's failure to timely pay benefits. This was in answer to a certified question from the Eleventh Circuit Court of Appeals. Subsequently, in *Lawson v. State Farm Mutual Insurance Company,* 802 F.2d 410 (11th Cir.1986), the Court of Appeals, conforming to the Georgia Supreme Court's answer to its certified question, held that an action to recover benefits was not prerequisite to maintenance of a suit for statutory penalties or punitive damages under the No–Fault Act.

The effect of the holdings in both *Teasley* and *Lawson* was that a sufficient *quid pro quo* existed in the No–Fault Act to justify the abolition of compensatory and punitive damages in a non-serious injury situation, and to justify punitive damages so as to prevent insurers from ignoring the due date of the statute with impunity so long as payment to suppliers was made sometime before suit for benefits was brought, so as to compel the insurers to perform their part of the no-fault scheme.

Obviously, the Georgia No–Fault Act provides a *quid pro quo* which is not found in the Georgia punitive damages statute. Furthermore, the No–Fault Act involves contract rights established under a state mandated contract of insurance. The constitutional scrutiny of the Georgia No–Fault Act is more closely analogous to the scrutiny given workers compensation acts or uninsured motorists statutes. Analogies to these types of statutes have been rejected repeatedly by courts throughout the country in scrutinizing tort reform limitations on noneconomic damages.

A constitutional challenge to either a workers compensation statute or automobile insurance no-fault statute would meet with no success, as both provide a *quid pro quo.* Workers compensation statutes eliminate the claimant's burden of proving fault in return for protection to the employer. The no-fault statute provides for prompt payment without proof of fault in return for a "serious injury" threshold and mandatory insurance coverage. However, such a *quid pro quo* does not exist in Georgia's punitive damages statute.

Other jurisdictions have recognized this distinction. At least five such decisions reject the contention that cases upholding the constitutionality of no-fault statutes or workers compensation statutes were relevant or precluded a heightened level of scrutiny for such tort reform statutes. *See Kansas Malpractice Victims v. Bell,* 243 Kan. 333, 757 P.2d 251 (1988); *Condemarin v. University Hospital,* 775 P.2d 348 (Utah 1989); *Smith v. Department of Insurance,* 507 So.2d 1080 (Fla.1987); *Wright v. Central Du Page Hospital,* 63 Ill.2d 313, 347 N.E.2d 736 (1976); and *Sofie v. Fibreboard Corp.,* 112 Wash.2d 636, 771 P.2d 711 (1989). In *Kansas Malpractice Victims v. Bell,* the Kansas Supreme Court rejected the defendant's analogy to both the Kansas Workers Compensation Statute and No Fault Statute in its constitutional scrutiny of the Kansas statute which placed a $250,000 cap on non-economic loss. In finding that both statutes provided a *quid pro quo* contrary to the tort reform statute, the Supreme Court stated:

> The legislation involved here seriously limits a plaintiff's right to recover nonpecuniary losses and then goes even further. It cuts off total recovery, and then requires the plaintiff to accept his award for future economic loss in the form of an annuity. In return for this infringement of his right, the injured patient does not receive prompt payment (as in no-fault insurance) or a reduced burden of proof (as in workers' compensation).

757 P.2d at 259.

In *Wright v. Central Du Page Hospital Association, supra,* the Illinois Supreme Court held:

Defendants argue that there is a societal *quid pro quo* in that the loss of recovery potential to some malpractice victims is offset by "lower insurance premiums and lower medical care costs for all recipients of medical care." This *quid pro quo* does not extend to the seriously injured medical malpractice victim and does not serve to bring the limited recovery provision within the rationale of the cases upholding the constitutionality of the Workmen's Compensation Act.

347 N.E.2d at 742.

Therefore, GM's and the State's reliance on *Teasley* ignores the distinction between the *quid pro quo* provided in no-fault acts and the case law throughout the country rejecting the analogy urged by Defendant GM and the State.

Cases dealing with a wrongful death measure of damages have no bearing, since the rule in Georgia is that the Georgia wrongful death statute is itself punitive. Punitive damages are not permitted in wrongful death actions in Georgia, for this would permit a double recovery to the plaintiff.

The right to recover for wrongful death did not exist at common law. In establishing that cause of action by statute, the legislature could prescribe the particular measure of damages recoverable under the statute. There is a *quid pro quo* in the wrongful death statute, in that in return for the statutory right of recovery (the *quid pro quo* similar to no-fault and workers' compensation laws), the damages recoverable may be limited.

This Court cannot make the distinction that Defendant GM and the State seek, i.e., to conclude that there is a difference in the basic right in Georgia for a plaintiff to recover full damages for tortious injuries, and that the Court should determine that the right to recover punitive damages is due a higher degree of scrutiny than is the right to recover compensatory damages.

In *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), Justice Stewart, concurring in the result, stated:

The claim under federal law is to be found in the allegation that the Act, if enforced, will deprive the appellees of certain property rights, in violation of the Due Process Clause of the Fifth Amendment. *One of those property rights*, and perhaps the sole cognizable one, *is a state-created right to recover full compensation for tort injuries.* The *Act impinges on that right by limiting recovery* in major accidents. (at p. 94) (Emphasis supplied.)

The Court is further convinced that not only do these Plaintiffs have standing to raise the constitutional challenges here at issue by virtue of the interests afforded protection under Georgia decisional law, but that the Plaintiffs' challenges have merit and the statute is subject to the constitutional defects as urged by the Plaintiffs under a minimal scrutiny or rational basis review. Thus the Court need apply no heightened scrutiny to the Tort Reform Act although the Court recognizes that a heightened scrutiny may be applied in tort reform analysis as is indicated by *Richardson v. Carnegie Library Restaurant, Inc.*, 107 N.M. 688, 763 P.2d 1153 (1988). This Court, in applying the rational basis standard of review of state and federal constitutional challenges as set forth in cases such as *Silverstein v. Gwinnett Hospital Authority*, 861 F.2d 1560 (11th Cir. 1988) and *Price v. Tanner*, 855 F.2d 820 (11th Cir.1988), has determined that the challenged subsections are unconstitutional.

■ The Court has already made the preliminary and initial findings that the product liability punitive damages section of the Tort Reform Act is discriminatory. The Court now finds that the Act discriminates as to the Plaintiffs herein as applied to each of the Court's initial findings. In considering the interest which the State claims to be protecting and the interest of those, including the Plaintiffs herein, who are disadvantaged by the classifications of the challenged statute, the Court concludes that the statute is not rationally related to a legitimate state interest. The classification is arbitrary and unreasonable, and no

fair and substantial relationship exists between the classification and the purpose of the law as advanced by the State.

The State interest initially advanced on the face of the punitive damage section of the Act is to ensure that the penalty it imposes through punitive damages is sufficient to penalize, punish, or deter a wrongdoer. O.C.G.A. § 51–12–5.1(a), (b), (c), and (d)(2). As heretofore indicated, the product liability punitive damage subsection here challenged does not meet this purpose.

Moreover, the purpose of the legislative scheme of this amendatory Tort Reform Act as advanced by the State is *to facilitate business operations* in Georgia by limiting tort liability for punitive damages and thus to preserve the viability of Georgia businesses. The state advances the argument that the Georgia General Assembly has balanced the interests of its citizens to fully compensate them if injured by a product of the business against the interests of the citizens in maintaining viable Georgia businesses. The Court finds that there is no *quid pro quo* to the Georgia citizens insofar as the product liability punitive subsection of the Tort Reform Act is concerned. Nor is the State's purpose, as expressed, legitimate. For example, in *Price v. Tanner, supra,* the State asserted, with respect to the Georgia Workers' Compensation Act dealing with occupational disease, that the section of the Act there involved ensured three legitimate State purposes: (1) to alleviate a heavy financial burden on industries where individuals are likely to file more claims; (2) to recognize that occupational diseases have a gradual onset making it difficult to determine when an aggravating injury actually occurs; and (3) to encourage the employment of handicapped persons. Both the majority and the minority of that court were of the opinion that the first two asserted purposes could not be classified as a legitimate state interest. While the majority were of the opinion that the third stated purpose, to encourage the employment of handicapped persons, was a sufficient legitimate state interest, the dissenting Circuit Judge did not even believe that the statute encouraged the employment of handicapped persons.

Thus, *Price v. Tanner, supra,* dispels any legitimate basis for the State interest in question in the Tort Reform Act being the viability of Georgia businesses continuing their operations and continuing to bring income to the State of Georgia even though the business may have erred in one of its products.

In *Browning–Ferris Industries v. Kelco Disposal, Inc., supra,* the Court held:

[3] To decide the instant case, however, we need not go so far as to hold that the Excessive Fines Clause applies just to criminal cases. Whatever the outer confines of the Clause's reach may be, we now decide only that it does not constrain an award of money damages in a civil suit *when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded.* To hold otherwise, we believe, would be to ignore the purposes and concerns of the Amendment, as illuminated by its history. (Footnote 4 omitted.) ([109 S.Ct.] at p. 2914) (Emphasis supplied.)

Petitioners, and some commentators, (Footnote 17 omitted) find in this history a basis for concluding that the Excessive Fines Clause operates to limit the ability of a civil jury to award punitive damages. We do not agree. Whatever uncertainties surround the use of amercements prior to Magna Carta, the compact signed at Runnymede was aimed at putting limits on the power of the King, on the "tyrannical extortions, under the name of amercements, with which John had oppressed his people," T. Taswell–Langmead, English Constitutional History 83 (T. Plucknett 10th ed. 1946), whether that power be exercised for purposes of oppressing political opponents, for raising revenue in unfair ways, or for any other improper use. See 2 W. Holdsworth, A History of English Law 214 (4th ed. 1936). These concerns are clearly inapposite in a case where a private party receives exemplary damages from another party, *and the government has no share in the recovery.* Cf. *United States v. Halper,* 490 U.S. ——, 109 S.Ct.

**1578**

1892, 104 L.Ed.2d 487 (1989) (Double Jeopardy Clause). ([109 S.Ct.] at· p. 2918) (Emphasis supplied.)

■ The Tort Reform Act, through the product liability punitive damage subsection, converted the pre-Tort Reform Act punitive damages statute of Georgia into a statute having the constitutional infirmity as set forth in *Browning–Ferris Industries*, because the State of· Georgia would have a right to receive a share of the damages awarded and the excessive fines clause of both the state and federal constitutions would be implicated. Thus, the Act, if the subsection allowing the State of Georgia to occupy the status of a judgment creditor entitled to 75% of any award of product liability punitive damages is allowed to stand, converts the civil nature action of the prior Georgia punitive damages statute into a statute where fines are being made for the benefit of the State, contrary to the constitutional prohibitions as to excessive fines and contrary to the double jeopardy clause of the Fifth Amendment to the Constitution of the United States.

■ The Court determines that O.C.G.A. § 51–12–5.1(e)(2) is unconstitutional as containing matter different from that expressed in the title of the Tort Reform Act and containing subject matter different from other subject matter in the body of the Act, in violation of Art. III, Sec. V, Par. III, of the Georgia Constitution. In *Nelson v. Southern Guaranty Insurance Company, supra,* the Court stated:

When the caption of an amendatory Act specifically limits the matters to be included in the amendment, and there is inserted in the body of the Act a completely unrelated provision of which the title gives no intimation, the constitutional prohibition against the passage of a law which "contains matter different from what is expressed in the title thereof" is violated.

221 Ga. 804, 807, 147 S.E.2d 424.

Moreover, that section of the statute denies equal protection to product liability punitive damage plaintiffs in its discrimination in favor of other nonproduct liability puni-

tive damage claimants in that those claimants retain 100% of any award rendered in their favor. The Court finds that there is no rational basis under the reasoning advanced by the State that the 75% award is a revenue producing measure inasmuch as it would be arbitrary to fail to assess all punitive damage awards if the purpose of assessing any award was to raise revenue for the State. The Court finds that revenue is incidental, and that the arbitrary and unreasonable provision is business oriented, designed to restrict injured plaintiffs of an incentive to bring actions to punish, penalize, or deter egregious business practices.

Establishing the State of Georgia as a non-party-at-interest judgment creditor in any event and under all circumstances insofar as product liability punitive damage claims are concerned is also arbitrary and fails to serve a rational purpose, inasmuch as there could be instances where, because of conduct by the State or any of its officers or agencies, it would be inequitable and unjust for the State to occupy such a position. With no qualifying conditions or exceptions in the statutory language here involved, the Court finds that this section is arbitrary and unconstitutional.

The Court next turns to the question whether the Tort Reform Act can stand with the sections challenged by the Plaintiffs being stricken as unconstitutional.

*Griffith v. Merritt,* 223 Ga. 562, 157 S.E.2d 23 (1967), holds:

We are of the opinion that Sec. 12(c) of the Act of 1967 contains matter different from that contained in the title of the Act and violates the cited section of the Georgia Constitution.

2. The appellants contend that if Subsec. (c) of Sec. 12 is invalid, then, of necessity, Subsec. (b) of the same section must be declared invalid. The rule of severability and non-severability where the statute, as here, contained no severability clause is stated in *Bennett v. Wheatley,* 154 Ga. 591, 595, 115 S.E. 83, 84, as follows: 'If the statute is in part constitutional and valid, and in part unconstitutional and invalid, and the objec-

tionable portion is so connected with the general scheme that, should it be stricken out, effect cannot be given to the legislative intent, the whole statute, section, or portion must fall; but where an Act cannot be sustained as a whole, the courts will uphold it in part, when it is reasonably certain that to do so would correspond with the main intent and purpose which the Legislature sought to accomplish by its enactment, if, after the unconstitutional part is stricken, there remains enough to accomplish that purpose. An Act can be pro tanto unconstitutional.'

Where an Act is partially unconstitutional because of containing provisions in the body of the Act not referred to in the title, the whole Act is not rendered inoperative if the legislative scheme is not defeated by the elimination of the unconstitutional part. *Hancock v. State,* 114 Ga. 439(2), 40 S.E. 317; *Whittendale v. Dixon,* 70 Ga. 721(2); *Prothro v. Orr,* supra [12 Ga. 36].

157 S.E.2d at pp. 28, 29.

The Court determines that with the challenged subsections of the statute stricken, that is, the second sentence of O.C.G.A. § 51–12–5.1(e)(1), and all of O.C.G.A. § 51–12–5.1(e)(2), the remaining portions of the Act can stand. The Court further declares that if O.C.G.A. § 51–12–5.1(e)(2) is not stricken, then the Georgia punitive damages section of the Tort Reform Act will not pass constitutional muster under the double jeopardy provisions of the state and federal constitutions or the excessive fines clauses of the state and federal constitutions. The Court declares that there can be no legitimate purpose for a state to involve itself in the area of civil damage litigation between private parties wherein punitive damages are a legitimate item of recovery, where the State, through the legislative process, preempts for itself a share of the award.

In summary, the Court decides that awarding compensation for human pain and suffering and the economic losses associated with such injuries is matter firmly rooted in our judicial system, and liberty,

safety, and the right to justice by remedying egregious wrongs is here involved. Being mindful that such fundamental individual rights are here at stake, it is the Court's view that the legislation here under review is so unreasonable and so arbitrary, and has such an absolute lack of any *quid pro quo* to seriously injured plaintiffs and such little deterrent effect on wrongful conduct of defendants causing such injuries, that it fails to pass the rational basis analysis for constitutional validity. The subsections challenged are facially unconstitutional, and it is the duty of the Court to so declare them void. The Court therefore declares that:

1. The one-award provision dealing with product liability punitive damages as set forth in the second sentence of O.C.G.A. § 51–12–5.1(e)(1) is unconstitutional, null and void, in that it violates the equal protection and due process clauses of the Georgia and federal constitutions.

2. O.C.G.A. § 51–12–5.1(e)(2) is unconstitutional, null and void, in that it violates the Georgia constitutional provision contained in Art. III, Sec. V, Par. III. The Tort Reform Act refers to more than one subject matter or contains matter different from what is expressed in the title thereof. Said section is further unconstitutional, null and void, in that it violates the due process and equal protection clauses of the Georgia and federal constitutions. Said section is further violative of the excessive fines provisions of the Eighth Amendment to the United States Constitution and Art. I, Sec. I, Par. XVII, of the Constitution of Georgia. Said section further violates the double jeopardy provision of the Fifth Amendment to the United States Constitution.

3. The Court declares that with the second sentence of O.C.G.A. § 51–12–5.1(e)(1) and all of O.C.G.A. § 51–12–5.1(e)(2) hereinabove declared unconstitutional, null and void, the remainder of the punitive damage section of the Tort Reform Act, as well as the other sections of the Act, can stand with these unconstitutional provisions stricken.

The Court has not deemed it necessary to reach and determine the other constitutional challenges urged by Plaintiffs to O.C. G.A. § 51–12–5.1(e). Nor has it been necessary to consider the Plaintiffs' constitutional challenges to O.C.G.A. §§ 51–12–5.1(f) and (g) in view of Defendant GM's concession that those subsections cannot be applied as to Plaintiffs' claims pending in this court.

The holdings and declarations hereinabove expressed constitute the judgment of the Court.

Finally, what the Court does *not* hold. The Plaintiffs in these cases have not contended and the Court does not hold that a proper statute that places a cap on punitive damage awards could not satisfy constitutional requirements if the cap is sufficiently substantial to reasonably relate to a deterrence of the conduct complained of, and if its provisions do not arbitrarily discriminate between tort claimants, and do not favor one class of business defendants over others, and do not make the State a non-party judgment creditor so as to gratuitously guarantee it a part of the award. The Court also does not hold that a manufacturer could not in any event assert a due process defense in a multiple substantial punitive damage award situation.

## APPENDIX A

### TORT REFORM ACT OF 1987.

Code Title 51 Amended.

No. 672 (House Bill No. 1).

### AN ACT

To provide substantive and comprehensive civil justice reforms affecting tort claims litigation; to provide a short title; to amend Title 51 of the Official Code of Georgia Annotated, relating to torts, so as to provide to certain members, directors, trustees, and officers of nonprofit hospitals, nonprofit, charitable, or eleemosynary institutions or organizations, or governmental entities immunity from civil liability under certain conditions; to provide that evidence of compensation, benefits, or other payments from collateral sources shall be admissible for consideration by the trier of fact in civil actions in which special damages are sought or evidence of same is otherwise introduced by the plaintiff; to provide under what circumstances punitive damages may be awarded because of the actions of a defendant; to provide for applicability of certain provisions; to provide a definition; to provide the purposes of punitive damage awards; to provide trial procedures for pleadings, evidentiary standards, findings of fact, and judgments for awards of punitive damages; to provide for determinations of punitive damage awards in different causes of action; to provide for product liability cases; to provide for the disposition of certain awards; to provide for cases in which the defendant has a specific intent to harm; to provide for all other cases in which punitive damages may be awarded; to provide for injuries to peace, happiness, or feelings; to provide that if the jury's verdict as to damages is clearly inadequate or excessive then the trial court may either order a new trial as to damages only or condition the denial of a new trial upon the parties' acceptance of a modified amount; to provide for application only to the first order of a new trial; to provide for a permissible apportionment of damages in certain causes of action among defendants according to the fault of each defendant the plaintiff is to some degree responsible for the injury or damages claimed; to provide that in such cases damages shall not be a joint liability or subject to contribution; to provide for construction and applicability; to provide for matters relative to the foregoing; to repeal conflicting laws; and for other purposes.

BE IT ENACTED BY THE GENERAL ASSEMBLY OF GEORGIA:

**Section 1.** This Act shall be known and may be cited as the "Tort Reform Act of 1987."

**Section 2.** Title 51 of the Official Code of Georgia Annotated, relating to torts, is amended by striking in its entirety Code Section 51–1–20, relating to the liability of directors and officers of public, charitable, or nonprofit hospitals, institutions, or orga-

nizations, and inserting in its place a new Code Section 51–1–20 to read as follows:

"51–1–20.   A person serving with or without compensation as a member, director, or trustee or as an officer without compensation of any nonprofit hospital or any nonprofit, charitable, or eleemosynary institution or organization or of any governmental agency, board, authority, or entity shall be immune from civil liability for any act or any omission to act arising out of such service if such person was acting in good faith within the scope of his or her official actions and duties and unless the damage or injury was caused by the willful or wanton misconduct of such person."

**Section 3.**   Said title is further amended by striking in its entirety Code Section 51–12–1, relating to types of damages, and inserting in its place a new Code Section 51–12–1 to read as follows:

"51–12–1.   (a) Damages may be either general or special, direct or consequential.

(b) In any civil action, whether in tort or in contract, for the recovery of damages arising from a tortious injury in which special damages are sought to be recovered or evidence of same is otherwise introduced by the plaintiff, evidence of all compensation, indemnity, insurance (other than life insurance), wage loss replacement, income replacement, or disability benefits or payments available to the injured party from any and all governmental or private sources and the cost of providing and the extent of such available benefits or payments shall be admissible for consideration by the trier of fact.   The trier of fact, in its discretion, may consider such available benefits or payments and the cost thereof but shall not be directed to reduce an award of damages accordingly."

**Section 4.**   Said title is further amended by striking in its entirety Code Section 51–12–5, relating to additional damages for aggravating circumstances, and inserting in its place a new Code Section 51–12–5 to read as follows:

"51–12–5.   (a) In a tort action in which there are aggravating circumstances, in either the act or the intention, the jury may give additional damages to deter the wrongdoer from repeating the trespass or as compensation for the wounded feelings of the plaintiff.

(b) This Code section shall apply only to causes of action for torts arising before July 1, 1987."

**Section 5.**   Said title is further amended by inserting immediately following Code Section 51–12–5 a new Code section, to be designated Code Section 51–12–5.1, to read as follows:

"51–12–5.1.   (a) As used in this Code section, the term 'punitive damages' is synonymous with the terms 'vindictive damages,' 'exemplary damages,' and other descriptions of additional damages awarded because of aggravating circumstances in order to penalize, punish, or deter a defendant.

(b) Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

(c) Punitive damages shall be awarded not as compensation to a plaintiff but solely to punish, penalize, or deter a defendant.

(d)(1) An award of punitive damages must be specifically prayed for in a complaint.   In any case in which punitive damages are claimed, the trier of fact shall first resolve from the evidence produced at trial whether an award of punitive damages shall be made.   This finding shall be made specially through an appropriate form of verdict, along with the other required findings.

(2) If it is found that punitive damages are to be awarded, the trial shall immediately be recommenced in order to receive such evidence as is relevant to a decision regarding what amount

of damages will be sufficient to deter, penalize, or punish the defendant in light of the circumstances of the case. It shall then be the duty of the trier of fact to set the amount to be awarded according to subsection (e), (f), or (g) of this Code section, as applicable.

(e)(1) In a tort case in which the cause of action arises from product liability, there shall be no limitation regarding the amount which may be awarded as punitive damages. Only one award of punitive damages may be recovered in a court in this state from a defendant for any act or omission if the cause of action arises from product liability, regardless of the number of causes of action which may arise from such act or omission.

(2) Seventy-five percent of any amounts awarded under this subsection as punitive damages, less a proportionate part of the costs of litigation, including reasonable attorney's fees, all as determined by the trial judge, shall be paid into the treasury of the state through the Fiscal Division of the Department of Administrative Services. Upon issuance of judgment in such a case, the state shall have all rights due a judgment creditor until such judgment is satisfied and shall stand on equal footing with the plaintiff of the original case in securing a recovery after payment to the plaintiff of damages awarded other than as punitive damages. A judgment debtor may remit the state's proportional share of punitive damages to the clerk of the court in which the judgment was rendered. It shall be the duty of the clerk to pay over such amounts to the Fiscal Division of the Department of Administrative Services within 60 days of receipt from the judgment debtor. This paragraph shall not be construed as making the state a party at interest and the sole right of the state is to the proceeds as provided in this paragraph.

(f) In a tort case in which the cause of action does not arise from product liability, if it is found that the defendant acted, or failed to act, with the specific intent to cause harm, there shall be no limitation regarding the amount which may be awarded as punitive damages.

(g) For any tort action not provided for by subsection (e) or (f) of this Code section in which the trier of fact has determined that punitive damages are to be awarded, the amount which may be awarded in the case shall be limited to a maximum of $250,000.00.

(h) This Code section shall apply only to causes of action arising on or after July 1, 1987."

**Section 6.** Said title is further amended by striking in its entirety Code Section 51-12-6, relating to the measure of damages for injury to peace, happiness, or feelings, and inserting in its place a new Code Section 51-12-6 to read as follows:

"51-12-6. In a tort action in which the entire injury is to the peace, happiness, or feelings of the plaintiff, no measure of damages can be prescribed except the enlightened consciences of impartial jurors. In such an action, punitive damages under Code Section 51-12-5 or Code Section 51-12-5.1 shall not be awarded."

**Section 7.** Said title is further amended by striking in its entirety Code Section 51-12-12, relating to determination of damages, and inserting in its place a new Code Section 51-12-12 to read as follows:

"51-12-12. (a) The question of damages is ordinarily one for the jury; and the court should not interfere with the jury's verdict unless the damages awarded by the jury are clearly so inadequate or so excessive as to be inconsistent with the preponderance of the evidence in the case.

(b) If the jury's award of damages is clearly so inadequate or so excessive as to any party as to be inconsistent with the preponderance of the evidence, the trial court may order a new trial as to damages only, as to any or all parties, or may condition the grant of such a new trial upon any party's refusal to accept an amount determined by the trial court.

(c) Only one grant of a new trial by the judge may be based upon the powers conferred by this Code section. The first grant of a new trial other than one ordered under this Code section and which order granting the new trial is not based on this Code section shall remain governed by Code Section 5-5-50."

**Section 8.** Said title is further amended by striking in their entirety Code Section 51-12-31, relating to the recovery against joint trespassers, and Code Section 51-12-32, relating to the right of contribution among joint trespassers and the effects of settlement, and inserting in their place new Code Sections 51-12-31, 51-12-32, and 51-12-33 to read as follows:

"51-12-31. Except as provided in Code Section 51-12-33, where an action is brought jointly against several trespassers, the plaintiff may recover damages for the greatest injury done by any of the defendants against all of them. In its verdict, the jury may specify the particular damages to be recovered of each defendant. Judgment in such a case must be entered severally.

51-12-32. (a) Except as provided in Code Section 51-12-33, where a tortious act does not involve moral turpitude, contribution among several trespassers may be enforced just as if an action had been brought against them jointly. Without the necessity of being charged by action or judgment, the right of a joint trespasser to contribution from another or others shall continue unabated and shall not be lost or prejudiced by compromise and settlement of a claim or claims for injury to person or property or for wrongful death and release therefrom.

(b) If judgment is entered jointly against several trespassers and is paid off by one of them, the others shall be liable to him for contribution.

(c) Without the necessity of being charged by an action or judgment, the right of indemnity, express or implied, from another or others shall continue unabated and shall not be lost or prejudiced by compromise and settlement of a claim or claims for injury to person or property or for wrongful death and release therefrom.

51-12-33. (a) Where an action is brought against more than one person for injury to person or property and the plaintiff is himself to some degree responsible for the injury or damages claimed, the trier of fact, in its determination of the total amount of damages to be awarded, if any, may apportion its award of damages among the persons who are liable and whose degree of fault is greater than that of the injured party according to the degree of fault of each person. Damages, if apportioned by the trier of fact as provided in this Code section, shall be the liability of each person against whom they are awarded, shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution.

(b) Subsection (a) of this Code section shall not affect venue provisions regarding joint actions.

(c) This Code section shall apply only to causes of action arising on or after July 1, 1987."

**Section 9.** All laws and parts of laws in conflict with this Act are repealed.

Approved April 8, 1987.