George W. CHADIMA, et al., Plaintiffs,

v.

NATIONAL FIDELITY LIFE INSURANCE COMPANY, Defendant,

and

State of Iowa, ex rel., Civil Reparations Trust Fund, Intervenor.

No. 3–90–CV–30058.

United States District Court, S.D. Iowa, Davenport Division.

March 25, 1994.

Thomas J. Shields, Lane & Waterman, Davenport, Iowa, for defendant.

Kevin H. Collins of Shuttleworth & Inger-soll, P.C., Cedar Rapids, Iowa, for plaintiffs.

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFFS' CLAIM FOR COMMON LAW ATTORNEY FEES AND THE PARTIES' POST TRIAL MOTIONS

BENNETT, United States Magistrate Judge.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION. | 1420 |
| II. | FACTUAL BACKGROUND. | 1422 |
| III. | STATE OF IOWA'S MOTION FOR JOINDER OR INTERVENTION. | 1423 |
| IV. | CHADIMA'S CLAIM FOR COMMON LAW ATTORNEY FEES. | 1424 |
| V. | NATIONAL FIDELITY'S TRIAL MOTION FOR JUDGMENT AS A MATTER OF LAW AND POST TRIAL MOTIONS. | 1425 |
| | A. Introduction | 1425 |
| | B. The Appropriate Standard for Determining National Fidelity's Post Trial Motions | 1426 |
| | C. National Fidelity's Challenge to Chadima's Recovery Under the Theory of First–Party Bad Faith | 1428 |
| | 1. Introduction and Overview of First–Party Bad Faith Under Iowa Law | 1428 |
| | 2. Was Chadima's Claim "Fairly Debatable" By National Fidelity | 1430 |
| | D. National Fidelity's Challenge to Chadima's Recovery Under Breach of Contract | 1433 |
| VI. | CONCLUSION. | 1435 |

This litigation arises from a dispute regarding which one of two National Fidelity Life Insurance Company ("National Fidelity") policies for George Milton Chadima was in effect at the time of his death in 1989. A jury returned a verdict for compensatory damages on Plaintiffs' breach of contract and first-party bad faith claims. The jury also awarded punitive damages on the bad faith claim. Plaintiffs seek an additional remedy of common law attorney fees. Plaintiffs also seek to overturn the jury finding by special interrogatory that National Fidelity's conduct was not directed specifically at the Plaintiffs. This would allow the Plaintiffs to defeat Intervenor State of Iowa's statutory claim of entitlement to 75 percent of the punitive damage award. National Fidelity, through post trial motions, under Federal Rules of Civil Procedure 50 and 59, is attacking the validity of the jury's verdict and subsequent judgment on both the breach of contract and first-party bad faith claims.

## I. *INTRODUCTION AND BACKGROUND.*

This breach of insurance contract and first-party bad faith case was removed from state court to the United States District Court for the Southern District of Iowa, Davenport Division, on April 30, 1990. The litigation arises as a result of the purchase of life insurance by George Milton Chadima from National Fidelity in January of 1986 and his attempt to obtain a modified or new policy from National Fidelity in 1989. George Milton Chadima died on October 26, 1989. The Plaintiffs in this litigation are his son, George W. Chadima, and the Swisher Trust and Savings Bank as trustees of the George Milton Chadima and Lillian Esther Chadima Trust; and Lillian Esther Chadima and George W. Chadima as Executors of the Estate of George Milton Chadima, Deceased (collectively referred to as "Chadima" or "Plaintiffs").

On March 15, 1993, the parties filed a consent to proceed before a United States magistrate judge in accordance with the provisions of 28 U.S.C. § 636(c). A jury trial commenced on January 18, 1994.

On January 20, 1994, the jury returned a verdict in favor of Chadima on both the breach of an insurance contract claim and first-party bad faith claim. The jury awarded the Plaintiffs $34,029.00 in compensatory damages and $100,000.00 in punitive damages. The punitive damages were awarded on the first-party bad faith claim. Judgment, based upon the jury verdict, was entered on January 24, 1994.

■ Concerning the punitive damages, in response to a special interrogatory required by Iowa Code § 668A.1(1)(b) (1993), the jury answered in the negative, "Whether the conduct of the defendant was directed specifically at the claimant, or at the person from which the claimant's claim is derived." Iowa Code § 668A.1(1)(b) (1993). As a result, "af-

ter payment of all applicable costs and fees, an amount not to exceed twenty-five percent of the punitive or exemplary damages awarded may be ordered paid to the claimant, with the remainder of the award to be ordered paid into a civil reparations trust fund administered by the state court administrator." Iowa Code § 668A.1(2)(b). If the jury had answered the special interrogatory that National Fidelity's conduct was directed specifically at Chadima, then Chadima would not be required to share the punitive damage award with the State of Iowa Civil Reparations Trust Fund. Iowa Code § 668A.1(2)(b) (1993).[1]

Not surprisingly, National Fidelity has filed post trial motions pursuant to Federal Rules of Civil Procedure 50 and 59 to set aside the jury's verdict and the judgment. Additionally, Chadima has filed a motion for entry of judgment pursuant to Federal Rule of Civil Procedure 50 seeking to set aside the jury's determination pursuant to

1. Iowa is one of only eight states to have passed legislation requiring payment of some portion of punitive damages to the state or state-sponsored funds. The rationale underlying Iowa's punitive damage legislation is "that 'a plaintiff is a fortuitous beneficiary of a punitive damage award simply because there is no one else to receive it.'" *Spaur v. Owens–Corning Fiberglas Corp.,* 510 N.W.2d 854, 869 (Iowa 1994) (citing *Shepherd Components v. Brice Petrides–Donahue & Associates,* 473 N.W.2d 612, 619 (Iowa 1991)). Section 668A.1 "was designed to divert a portion of a resulting punitive damage award to a public purpose." *Spaur,* 510 N.W.2d at 869 (citing *Fernandez v. Curley,* 463 N.W.2d 5, 8 (Iowa 1990)).

The other seven states with similar punitive damage legislation are: Colorado (Colo.Rev.Stat. § 13–21–102[4] [1987] ), Florida (Fla.Stat. § 768.73[2][b] [1993 Supp.] ), Georgia (Ga.Code Ann. § 51–12–5.1[e][2] [1993 Supp.] ), Missouri (Mo.Rev.Stat. § 537.675[2] [1992 Supp.] ), New York (N.Y.Civ.Prac.L. & R. § 8701 [McKinney 1993 Supp.] ), Oregon (Or.Rev.Stat. § 18.540[1] [1991] ) and Utah (Utah Code Ann. § 78–18–1[3] [1992] ).

Four of the eight states have addressed the constitutionality of such provisions. Two courts have held such statutes to be unconstitutional. *Kirk v. Denver Pub. Co.,* 818 P.2d 262 (Colo.1991) (Colorado Supreme Court held that a statute requiring payment of one-third of the punitive damages to the state general fund was an unconstitutional taking of private property without just compensation); *McBride v. General Motors Corp.,* 737 F.Supp. 1563 (M.D.Ga.1990) (Federal dis-

trict court held unconstitutional, in violation of the excessive fines provision of the Fifth Amendment of the United States Constitution, a provision requiring 75 percent of a punitive damage award, in product liability cases only, be paid to the state treasury). Three other courts have upheld the constitutionality of such statutes. *Gordon v. State,* 585 So.2d 1033 (Fla.Dist.Ct.App. 1991) (Florida appellate court upheld the constitutionality of Florida statute requiring payment of 60 percent of the punitive damage award to the state general revenue fund or public medical assistance trust fund depending on the type of cause of action. The court found no unconstitutional taking of property without due process because a plaintiff had no constitutionally protectable right to recover damages), *aff'd,* 608 So.2d 800 (Fla.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1647, 123 L.Ed.2d 268 (1993); *Shepherd Components v. Brice Petrides–Donohue Associates,* 473 N.W.2d 612 (Iowa 1991) (Iowa Supreme Court upheld the constitutionality of § 668A.1(2)(b)); *Mack Trucks, Inc. v. Conkle,* 263 Ga. 539, 436 S.E.2d 635 (1993) (Georgia Supreme Court upheld statute providing that 75 percent of punitive damage award paid into state treasury only in product liability cases did not violate equal protection clause of Fourteenth Amendment nor constitute a taking under Fifth and Fourteenth Amendments). The differing results seen in the *Conkle* and *McBride* decisions regarding Georgia's statute can be explained in part by the fact that the two respective courts analyzed the Georgia statute provision under different federal constitutional amendments.

§ 668A.1(1)(b) that National Fidelity's conduct was not directed specifically at Chadima. Additionally, pursuant to an agreement of the parties at trial, deferring the questions of Chadima's entitlement to and amount of reasonable common law attorney fees, Chadima has moved for attorney fees and costs in the amount of $60,540.21. National Fidelity has strenuously resisted Chadima's entitlement to and the amount of requested attorney fees.

A hearing on post trial motions and Chadima's request for attorney fees was held on March 11, 1994. Chadima was represented by Kevin H. Collins of Shuttleworth & Ingersoll, P.C., Cedar Rapids, Iowa. National Fidelity was represented by Thomas J. Shields of Lane & Waterman, Davenport, Iowa. The State of Iowa, as a result of their interest in 75 percent of the punitive damages being awarded to the civil reparations trust fund was represented at the hearing by Richard E. Mull, Iowa Assistant Attorney General. Immediately prior to the hearing on post trial motions, the State of Iowa *ex relatione* Civil Reparations Trust Fund filed a written motion for joinder or intervention. Before turning to Chadima's motion for attorney fees and the post trial motions filed by Chadima and National Fidelity, the court will briefly set forth the factual background and address the State of Iowa's motion for joinder or intervention.

## II. *FACTUAL BACKGROUND.*

The following facts are not seriously in dispute. In January of 1986 National Fidelity issued Policy No. 550529, a declining death benefit policy, to George Milton Chadima. This was not the coverage that George Milton Chadima desired and he requested that National Fidelity convert the policy to a fixed death benefit policy of $100,000.00. National Fidelity declined to convert the policy but indicated it would be willing to issue a new fixed death benefit policy with a death benefit of $90,000.00. National Fidelity instructed George Milton Chadima to return his policy together with an executed policy request form. In July 1989, George Milton Chadima sent to National Fidelity his insur-

ance policy and the executed policy owner request form.

The policy owner request form indicated that the change would not be effective until approved in writing by the company. However, George Milton Chadima's actual policy of insurance provided that any changes in coverage were effective upon receipt by the company.

George Milton Chadima died on October 26, 1989 before the policy had been changed or reissued by National Fidelity. As of the date of George Milton Chadima's death, his original policy had a face value of $134,-973.20. George Milton Chadima was not notified in writing by National Fidelity prior to his death of the change in policies he had requested.

On January 11, 1990, National Fidelity tendered a check in the amount of $91,423.97 in full payment of the death benefits under Policy No. 550529 (this included the $90,-000.00 amount of the policy plus interest due under the policy at 7.5 percent from the date of death). Prior to forwarding this check, Catherine Bicknell White, a claims examiner for National Fidelity, reviewed the claim and the company file and indicated she believed Chadima was entitled to the amount of $136,-692.72. However, after consultation between Jan Perrine, the claims manager for National Fidelity, and Robert Burkett, National Fidelity's association general counsel, a decision was made to tender a check in the amount of $91,423.97 in full payment.

Plaintiffs, through their attorneys, promptly notified National Fidelity that the policy had not been changed and that the Plaintiffs were entitled to the greater amount arising under the initial policy. National Fidelity initially refused to pay the full amount due under the original policy.

At this posture of the proceedings, there are substantial factual conflicts and the parties' assertions of what transpired differ dramatically. In Plaintiffs' view, associate general counsel Robert Burkett and claims manager Jan Perrine intentionally concealed the fact that the policy request form had not been acted upon in an attempt to persuade the Plaintiffs to accept the lesser amount

that would be due them under the newer policy requested by George Milton Chadima.

National Fidelity characterized these subsequent events as an honest attempt by Ms. Perrine and Mr. Burkett to determine whether the Plaintiffs were due the $90,-000.00 under the requested policy change by George Milton Chadima or the $136,692.72 due under the original policy (because the change requested by George Milton Chadima had not become effective).

In any event, it is undisputed that on February 22, 1990, National Fidelity forwarded to the Plaintiffs an additional check in the amount of $46,072.89—which represents the amount due under the original policy plus accrued interest. Both the original $90,000.00 check and the subsequent $46,-072.89 check included release language on the back of the checks requiring the Plaintiffs to waive all other claims they may have against National Fidelity. Plaintiffs insisted on a written agreement allowing Plaintiffs to negotiate the checks tendered by National Fidelity without waiving any of their claims. The Plaintiffs and National Fidelity negotiated with each other concerning such a written agreement but were unable to arrive at an agreement. The undisputed evidence is that National Fidelity orally instructed Plaintiffs' counsel to cross out the release language and cash the checks. The Plaintiffs testified they believed they had been misled by National Fidelity throughout their efforts to ascertain which policy was in effect and, therefore, refused to cross out the release language.

### III. STATE OF IOWA'S MOTION FOR JOINDER OR INTERVENTION.

At the beginning of the hearing on post trial motions held on March 11, 1994, both Chadima and National Fidelity indicated that they would not resist the State of Iowa's motion for joinder or intervention. The court indicated to the parties that they would have an opportunity to file written resistances to the State's motion but the parties agreed the State had a right to intervene and that any further resistances or hearings on the issue would unnecessarily add to the cost and delay of this litigation. The court applauds the candor and concerns of the parties. The court, during the March 11, 1994 hearing, orally granted the State's motion to intervene. The court will briefly explain why the motion was granted.

Federal Rule of Civil Procedure 24(b)(2) provides that upon timely application the court may allow an applicant to intervene when the applicant's claim or defense and the main action share a common question of law or fact.[2] See 7C Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1911 at 355 (2d ed. 1986). It is within the trial court's discretion to allow an applicant to intervene. See Webster Groves Sch. Dist. v. Pulitzer Pub. Co., 898 F.2d 1371, 1377 (8th Cir.1990). In exercising its discretion, the court is to consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. See 7C Wright, Miller & Kane, supra, § 1911 at 355 (2d ed. 1986). Any doubts the court has concerning intervention are to be resolved in favor of the applicant for intervention. See Corby Recreation, Inc. v. General Elec. Co., 581 F.2d 175, 177 (8th Cir.1978) (quoting Kozak v. Wells, 278 F.2d 104, 112 (8th Cir. 1960)).

Under Federal Rule of Civil Procedure 24(a)(2), a timely motion to intervene should be granted when the following three conditions are met:

1) the proposed intervenor has an interest in the subject matter of the action; 2) the interest may be impaired; and 3) the interest is not adequately represented by an existing party to the action.

Sierra Club v. Robertson, 960 F.2d 83, 85 (8th Cir.1992).[3] "Doubts regarding the pro-

---

**2.** Federal Rule of Civil Procedure 24(b) states: Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: ... (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

**3.** Federal Rule of Civil Procedure 24(a) provides:

Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of

priety of permitting intervention should be resolved in favor of allowing it, because this serves the judicial system's interest in resolving all controversies in a single action." *Id.* at 86. Iowa Code § 668A.1(2)(b) provides as follows:

> ... after payment of all applicable costs and fees, an amount not to exceed twenty-five percent of the punitive or exemplary damages awarded may be ordered paid to the claimant, with the remainder of the award to be ordered paid into a civil reparations trust fund administered by the state court administrator. Funds placed in the civil reparations trust shall be under the control and supervision of the executive council, and shall be disbursed only for purposes of indigent civil litigation programs or insurance assistance programs.

Thus, the State of Iowa has an interest in the punitive damage award that is both separate, distinct, and adverse to that of Chadima and, potentially, National Fidelity. Also, neither Chadima nor National Fidelity could adequately represent the interests of the State of Iowa in the punitive damage award. Therefore, the State of Iowa *ex relatione* Civil Reparations Trust Fund may intervene in this litigation pursuant to Federal Rule of Civil Procedure 24(a)(2).

## IV. *CHADIMA'S CLAIM FOR COMMON LAW ATTORNEY FEES.*

■ Near the conclusion of the trial, and by agreement of the parties, the court deferred to post trial proceedings Chadima's claim for common law attorney fees. Under Iowa law "[t]he determination of a common law attorney fee award rests in the court's equitable powers." *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co.*, 510 N.W.2d 153, 158 (Iowa 1993) (citing *Alyeska Pipeline Serv. v. Wilderness Soc'y*, 421 U.S. 240, 257–58 n. 30, 95 S.Ct. 1612, 1621–22 n. 30, 44 L.Ed.2d 141 (1975)). Moreover, "the court should not delegate its equitable power to the jury." *Id.* at 159.

Chadima has now filed two affidavits in support of attorney fees. Chadima is seeking a total of $60,540.21 in attorney fees and

expenses. Chadima's claim for attorney fees and expenses has been strenuously resisted by National Fidelity. At the March 11, 1994 hearing on post trial motions, National Fidelity requested an opportunity to engage in discovery to support its resistance concerning the reasonableness of the amount of attorney fees and costs claimed by Chadima. At that hearing, the court indicated it would first decide the question of Chadima's entitlement to common law attorney fees and, if entitled to fees, would then provide National Fidelity with an opportunity for discovery followed by an evidentiary hearing to determine the amount of fees to be awarded.

■ The general rule in Iowa is that a party is not entitled to attorney fees in the absence of a contractual or statutory provision allowing such an award. *Hockenberg Equip. Co.*, 510 N.W.2d at 158. This rule, and its exception, is stated by the Iowa Supreme Court in *Suss v. Schammel*, 375 N.W.2d 252, 256 (Iowa 1985), as follows:

> Attorney fees are generally not recoverable as damages in the absence of a statute or a provision in a written contract. *See, e.g., Lickteig v. Iowa Dep't of Transp.*, 356 N.W.2d 205, 212 (Iowa 1984). This general rule, however, is subject to an exception. In *Kuiken v. Garrett*, we allowed attorney fees on common law theories because defendants' conduct was "oppressive and tinctured with legal malice." 243 Iowa 785, 800, 51 N.W.2d 149, 158 (1952). *See also Harmont v. Sullivan*, 128 Iowa 309, 317, 103 N.W. 951, 954 (1905) (attorney fees recoverable where there was "connivance" by one litigant to "harass and injure" other litigant).

In *Hockenberg Equip. Co.*, the court observed that the exception to the general rule is "rare" and available only "when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 158 (citing *Alyeska Pipeline Serv.*, 421 U.S. at 258–59, 95 S.Ct. at 1622).

■ In *Hockenberg Equip. Co.*, the court noted that while it recognized "this exception, the exact standard is not clear." *Id.* at

---

the action may as a practical matter impair or impede the applicant's ability to protect that in-

terest, unless the applicant's interest is adequately represented by the existing parties.

158. The court also observed that "[o]ur most recent treatment of the issue suggests that the recovery of attorney fees requires a showing of culpability. beyond the showing required for punitive damages." *Id.* at 159. In 1986, the enactment of Iowa Code chapter 668A, 1986 Iowa Acts ch. 1211, § 42, displaced the prior Iowa common law "with respect to the standard for recovery of punitive damages." *Hockenberg Equip. Co.,* 510 N.W.2d at 159. Under § 668A.1, "the plaintiff seeking a punitive damage award must prove that the defendant's conduct amounted to a willful and wanton disregard for the rights of another." *Id.* In examining its prior precedents, the Iowa Supreme Court noted that the standard for common law attorney fees "require at the very least a showing that the Defendant's culpability exceeded the section 668A.1 standard." *Id.*[4]

The court in *Hockenberg Equipment Co.* concluded that:

> Therefore, a plaintiff seeking common law attorney fees must prove that the culpability of the defendant's conduct exceeds the "willful and wanton disregard for the rights of another"; such conduct must rise to the level of oppression or connivance to harass or injure another.

*Id.* at 159–60. Chadima's proof on both the breach of contract claim and the first-party bad faith claim clearly fail to meet the rarified standard of proof required by *Hockenberg Equipment Co.* The court does not believe that Chadima's evidence exceeds the "willful and wanton disregard for the rights of another" punitive damage standard necessary to trigger an award of common law attorney fees. Conversely, Chadima's evidence does not "rise to the level of oppression or connivance to harass or injure another." *Hockenberg Equip. Co.,* 510 N.W.2d at 159-60. Chadima is not entitled to common law attorney fees. Thus, this court need not reach the question of the reasonableness of Chadima's requested fees.[5]

## V. *NATIONAL FIDELITY'S TRIAL MOTION FOR JUDGMENT AS A MATTER OF LAW AND POST TRIAL MOTIONS.*

### A. *Introduction*

At the conclusion of the jury trial, National Fidelity moved orally and in writing for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. On February 1, 1994, National Fidelity filed a Renewed Motion for Judgment as a Matter of Law, or in the Alternative, for New Trial pursuant to Federal Rules of Civil Procedure 50 and 59. These motions were timely resisted by Chadima, extensively briefed by the parties and fully argued at the March 11, 1994 hearing on post-trial motions. The thrust of National Fidelity's trial motion for judgment as a matter of law and post trial motions may be summarized as follows: (1) because National Fidelity's obligation to pay Chadima under the fixed death benefit policy or declining death benefit policy was fairly debatable, there can be no finding of bad faith as a matter of law; (2) that there was no legally sufficient evidentiary basis upon which a reasonable jury could find that National Fidelity breached its contract of insurance with Chadima; (3) that Chadima failed to mitigate damages by refusing to negotiate the checks

---

4. As an example of its prior case law, suggesting a higher standard for common law attorney fees than for punitive damages, the Iowa Supreme Court noted that in *Suss v. Schammel,* 375 N.W.2d 252, 256 (Iowa 1985), the court required a finding of "oppressive" conduct for an award of attorney fees. Oppressive conduct denotes "conduct that is difficult to bear, harsh, tyrannical, or cruel. *See, e.g.,* Black's Law Dictionary 1093 (6th ed.1990); The American Heritage Dictionary 872 (2d College Ed.1985)." *Hockenberg Equip. Co.,* 510 N.W.2d at 159.

5. While the court expresses no opinion concerning the reasonableness of Chadima's requested fees, one additional observation regarding the fee request is in order. The itemization of fees requested by Chadima appears to fall short of the requirements set forth by this court in *Houghton v. Sipco, Inc.,* 828 F.Supp. 631, 643–44 (S.D.Iowa 1993). In *Houghton,* the court criticized "block billing"—where billing records indicate that a block of time was spent but fail to disclose how much time was expended by each attorney on each task. In the context of an ADEA and ERISA action, the court observed "block billing, while no doubt utilized by some firms in the greater Des Moines market area, is grossly insufficient to satisfy the 'adequate itemization' requirement of Local Rule of Court 22 and federal fee-shifting statutes in general." *Houghton,* 828 F.Supp. at 644.

sent by National Fidelity which constituted full payment of the benefits to Chadima under the declining death benefit policy; and (4) that Chadima failed to adduce sufficient evidence pursuant to Iowa Code § 668A.1 to recover exemplary or punitive damages. Before turning to the merits of National Fidelity's assertions, the court will address the appropriate standard for determining National Fidelity's trial and post trial motions.

### B. The Appropriate Standard for Determining National Fidelity's Post Trial Motions

While neither Chadima, National Fidelity nor Intervenor State of Iowa has raised the question, "[t]here is some uncertainty about whether federal courts should apply state law standards or federal law standards to motions for a judgment notwithstanding the verdict in diversity cases." *Keenan v. Computer Assoc. Int'l, Inc.*, 13 F.3d 1266, 1268 n. 3 (8th Cir.1994).[6]

Federal Rule of Civil Procedure 50 entitled "Judgment as a Matter of Law in Actions Tried by Jury; Alternative Motion for New Trial; Conditional Rulings" states in relevant part:

(a) JUDGMENT AS A MATTER OF LAW.

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

(b) RENEWAL OF MOTION FOR JUDGMENT AFTER TRIAL; ALTERNATIVE MOTION FOR NEW TRIAL. Whenever a motion for a judgment as a matter of law made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Such a motion may be renewed by service and filing not later than 10 days after entry of judgment. A motion for a new trial under Rule 59 may be joined with a renewal of the motion for judgment as a matter of law, or a new trial may be requested in the alternative . . . .

Fed.R.Civ.P. 50(a) & (b).[7]

Federal Rule of Civil Procedure 59 entitled "New Trials; Amendment of Judgments" states in relevant part:

---

**6.** The circuits are in conflict over what standard should be applied in diversity cases. *Compare Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1181 (7th Cir.1992) ("In diversity cases, state law governs the standard of review of a denial of a motion for judgment notwithstanding the verdict."), *cert. denied*, —— U.S. ——, 113 S.Ct. 1274, 122 L.Ed.2d 669 (1993) with *Rotondo v. Keene Corp.*, 956 F.2d 436, 438 (3rd Cir.1992) (applying federal law standard). In *Keenan*, however, the court did not resolve the question of whether federal or state law controls the motion for judgment notwithstanding the verdict in a diversity case because it found that "the federal standard and the Minnesota standard are virtually identical." *Keenan*, 13 F.3d at 1269 n. 3. Similarly, it is unnecessary for the court to resolve that issue in this litigation as the federal standard for motions notwithstanding the verdict and the Iowa standard for such motions are nearly identical. *Compare White v. Pence*, 961 F.2d 776, 779 (8th Cir.1992) (court must view "evidence in the light most favorable to the pre-

vailing party") with *Federal Land Bank v. Woods*, 480 N.W.2d 61, 65 (Iowa 1992) (court "must view the evidence in the light most favorable to the party against whom the motion is directed") and *Hockenberg Equip. Co.*, 510 N.W.2d at 156 (" '[the] evidence, taken in the light most favorable to the party resisting the motion, regardless [of] whether the evidence was contradicted, and taking every legitimate inference that might be fairly or reasonably deducted therefrom, showed that the movant was entitled to a directed verdict at the close of all evidence.' ") (quoting *Suss*, 375 N.W.2d at 255).

**7.** While Rule 50 was amended effective December 1, 1993, the amendment was technical in nature. The Committee Notes to Rule 50 indicate:

This technical amendment corrects an ambiguity in the test of the 1991 revision of the rule, which, as indicated in the Notes, was not intended to change the existing standards under which "directed verdicts" could be granted.

(a) GROUNDS. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

Fed.R.Civ.P. 59(a).

Because there has been some confusion in the district courts in this circuit[8] and because there are substantial differences in the standards to be applied under Federal Rules of Civil Procedure 50 and 59, the court will examine the appropriate standard to be applied under each rule. As the court recently stated in *White v. Pence*, 961 F.2d 776, 779 (8th Cir.1992), "it is evident that the standards for considering a motion for j.n.o.v. differ thoroughly from those governing consideration of a motion for new trial." The court in *Pence* carefully delineated the appropriate standards between these two motions.

Thus, in determining a motion for j.n.o.v. (and the current parlance of Federal Rule of Civil Procedure 50—a motion for judgment as a matter of law)[9], the court in *Pence* observed:

> the question is a legal one, whether there is sufficient evidence to support a jury verdict. This court must analyze the evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility. *See Dace v. ACF Indus., Inc.,* 722 F.2d 374, 375–76 (8th Cir.1983), *supplemented,* 728 F.2d 976 (1984). We have also stated that to sustain a motion for j.n.o.v., all the evidence must point one way and be susceptible of no reasonable inference sustaining the position of the nonmoving party. *Id.* at 375; *Washburn v. Kansas City Life Ins. Co.,* 831 F.2d 1404, 1407 (8th Cir.1987); *Brown [v. Syntex Lab., Inc.],* 755 F.2d [668] at 671 [(8th Cir.1985)]. These principles have no application to the consideration of a motion for new trial on the ground that the verdict is against the weight of the evidence.

*Pence,* 961 F.2d at 779 (footnotes omitted). *See also First Dakota Nat'l Bank v. Saint Paul Fire & Marine Ins. Co.,* 2 F.3d 801, 808–09 (8th Cir.1993). Thus, this standard requires the district court to:

> "consider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evi-

---

This amendment makes clear that judgments as a matter of law in jury trials may be entered against both plaintiffs and defendants and with respect to issues or defenses that may not be wholly dispositive of a claim or defense. Fed.R.Civ.P. 50 advisory committee's note.

8. In *United States v. Schay,* 746 F.Supp. 877, 880 (E.D.Ark.1990), *rev'd sub nom. White v. Pence,* 961 F.2d 776 (8th Cir.1992), the court stated: [T]his court has, over the last several years, had occasion to consider the standard to be applied in ruling on motions for a new trial several times, and must confess that this court simply does not know with any certainty what standard is to be applied by the trial courts in this circuit. The court respectfully believes that this confusion is occasioned by changing and shifting language contained in various opinions of the Court of Appeals for this circuit.

This confusion has apparently been alleviated by the court's decision in *White v. Pence,* 961 F.2d 776 (8th Cir.1992). "As to the standard to be applied in considering motions for a new trial, at least in this court's view, the 'law' in the Eighth Circuit before this court's decision in *White v. Pence,* 961 F.2d 776 (8th Cir.1992) had been cloudy, if not opaque." *Jackson v. Swift–Eckrich, Inc.,* 836 F.Supp. 1447, 1450 (W.D.Ark.1993).

9. "[P]rior to 1991 amendments made the Federal Rules of Civil Procedure, a Rule 50 motion was a motion for directed verdict or motion for judgment notwithstanding the verdict. The 1991 amendments merely changed the names of these motions, but the standard for application of this rule remains the same." *Jackson,* 836 F.Supp. at 1449.

dence ·in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit· of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from· the evidence."

*Minneapolis Comm. Dev. Agency v. Lake Calhoun Assoc.,* 928 F.2d 299, 301 (8th Cir. 1991) (quoting *Atlas Pile Driving Co. v. Dicon Fin. Co.,* 886 F.2d 986, 989 (8th Cir. 1989)); *McAnally v. Gildersleeve,* 16 F.3d 1493, 1496 (8th Cir.1994).

In contrast, concerning motions for new trial under Federal Rule of Civil Procedure 59, the court in *Pence* observed:

> With respect to motions for new trial on the question of whether the verdict is against the weight of the evidence, we have stated: "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain a verdict.'" *Ryan v. McDonough Power Equip.,* 734 F.2d 385, 387 (8th Cir. 1984) (citation omitted). Similar language appears in *Brown,* 755 F.2d at 671–73; *Slatton [v. Martin K. Eby Const. Co., Inc.],* 506 F.2d [505] at 508 n. 4 [ (8th Cir.1974) ]; *Bates [v. Hensley ]* 414 F.2d [1006] at 1011 [ (8th Cir.1969) ], and early authority cited in *Bates. See also Leichihman v. Pickwick Int'l,* 814 F.2d 1263, 1266 (8th Cir.), *cert. denied,* 484 U.S. 855, 108 S.Ct. 161, 98 L.Ed.2d 116 (1987). These cases establish the fundamental procedures or methodology to be applied by the district court in considering new trial motions and are in contrast to those procedures governing motions for j.n.o.v.

*Id.* at 780. With these principles in mind concerning the standards for post trial motions under Federal Rule of Civil Procedure 50 and 59, the court turns to the merits of National Fidelity's motions.

## C. National Fidelity's Challenge to Chadima's Recovery Under the Theory of First–Party Bad Faith

### 1. Introduction and Overview of First–Party Bad Faith Under Iowa Law

■ National Fidelity's challenge to Chadima's recovery on their first-party bad faith theory arises principally from their assertion that, under any view of the facts, National Fidelity could not have committed first-party bad faith as a matter of law. This is premised on National Fidelity's view that even if they were wrong in initially failing to pay the greater amount under the original policy issued to George Milton Chadima, their initial denial was "fairly debatable". Under well settled Iowa principles of first-party bad faith, if a claim is "fairly debatable" then, by definition, first-party bad faith does not exist. In order to address National Fidelity's argument, in the context of the present State of Iowa law concerning first-party bad faith, an analysis and overview of Iowa law regarding first-party bad faith is helpful.

The tort of first-party bad faith resulting from an insurer's refusal to settle a first-party insurance claim with an insured was first recognized by the California Supreme Court. In *Gruenberg v. Aetna Ins. Co.,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973), an insured brought an action against his insurers and others, alleging bad faith in the denial of payment on three fire insurance policies. The California Supreme Court held:

> [I]n every insurance contract there is an implied covenant of good faith and fair dealing. The duty to so act is immanent in the contract whether the company is attending to the claims of third persons against the insured or the claims of the insured itself. Accordingly, when the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.

*Id.* at 575, 108 Cal.Rptr. at 486, 510 P.2d at 1038.

The Iowa Supreme Court has recognized that an insurer may be responsible for the tort of first-party bad faith in certain situations where the insurer disputes the in-

sured's right to recover under an insurance policy.[10] *North Iowa State Bank v. Allied Mut. Ins. Co.,* 471 N.W.2d 824, 828 (Iowa 1991); *Dirks v. Farm Bureau Mut. Ins. Co.,* 465 N.W.2d 857, 861 (Iowa 1991); *Kiner v. Reliance Ins. Co.,* 463 N.W.2d 9, 12 (Iowa 1990); *Kirk v. Farm & City Ins. Co.,* 457 N.W.2d 906, 910–11 (Iowa 1990); *Dolan v. Aid Ins. Co.,* 431 N.W.2d 790, 794 (Iowa 1988).

Prior to recognizing first-party bad faith claims, the Iowa Supreme Court had recognized a third-party bad faith cause of action for an insurer's representation of an insured in a third-party liability claim. *See Pirkl v. Northwestern Mut. Ins. Ass'n,* 348 N.W.2d 633, 635 (Iowa 1984); *Wierck v. Grinnell Mut. Reinsurance Co.,* 456 N.W.2d 191, 194–95 (Iowa 1990); *Kooyman v. Farm Bureau Mut. Ins. Co.,* 315 N.W.2d 30, 34–37 (Iowa 1982). The court's reasoning is that an insurer, in handling a claim for in excess of policy limits, owes a fiduciary duty to the insured to act responsibly in settlement negotiation to prevent exposure of the insured to unreasonable risk. *Wierck,* 456 N.W.2d at 194–95. The insurer owes a duty to its insured to investigate the claim and take such affirmative action as is necessary to protect the insured's interests. *Pirkl,* 348 N.W.2d at 635. In both first-party and third-party situations, the duty of good faith arises out of the insurance contract and runs from the insurer to the insured. In a third-party bad faith case, the issue is whether the insurer acted in bad faith toward the insured by failing to settle a third-party's claim within policy limits. *See Kooyman,* 315 N.W.2d at 34–37. In a first-party bad faith claim, however, the issue is whether the insurer is guilty of bad faith in failing to pay the insured's own claim.[11] *See Dolan,* 431 N.W.2d at 792.

**10.** The Iowa Supreme Court noted in *Dolan v. Aid Ins. Co.,* 431 N.W.2d 790 (Iowa 1988), that a majority of the jurisdictions recognize first-party bad faith claims. *Dolan,* 431 N.W.2d at 791. The court pointed out that the following jurisdictions had recognized the tort of first-party bad faith:

> *Chavers v. National Sec. Fire & Casualty Co.,* 405 So.2d 1 (Ala.1981); *United Serv. Auto Ass'n v. Werley,* 526 P.2d 28 (Alaska 1974); *Noble v. National Am. Life Ins. Co.,* 128 Ariz. 188, 624 P.2d 866 (1981); *Aetna Casualty & Sur. Co. v. Broadway Arms Corp.,* 281 Ark. 128, 664 S.W.2d 463 (1984); *Gruenberg v. Aetna Ins. Co.,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973); *Travelers Ins. Co. v. Savio,* 706 P.2d 1258 (Colo.1985); *Grand Sheet Metal Prod. Co. v. Protection Mut. Life Ins. Co.,* 34 Conn.Supp. 46, 375 A.2d 428 (1977); *Sullivan v. Allstate Ins. Co.,* 111 Idaho 304, 723 P.2d 848 (1986); *St. Paul & Marine v. Cumiskey,* 204 Mont. 350, 665 P.2d 223 (1983); *United States Fidelity & Guar. Co. v. Peterson,* 91 Nev. 617, 540 P.2d 1070 (1975); *State Farm Gen Ins. Co. v. Clifton,* 86 N.M. 757, 527 P.2d 798 (1974); *Corwin Chrysler–Plymouth, Inc. v. Westchester Fire Ins.,* 279 N.W.2d 638 (N.D. 1979); *Hoskins v. Aetna Life Ins. Co.,* 6 Ohio St.3d 272, 6 OBR 337, 452 N.E.2d 1315 (1983); *Christian v. American Home Assurance Co.,* 577 P.2d 899 (Okla.1978); *Bibeault v. Hanover Ins.,* 417 A.2d 313 (R.I.1980); *Nichols v. State Farm Mut. Ins. Co.,* 279 S.C. 336, 306 S.E.2d 616 (1983); *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368 (1978).

*Id.* at 791 n. 1. Several other jurisdictions have recognized the tort of first-party bad faith: *Pickett v. Lloyd's,* 131 N.J. 457, 621 A.2d 445 (1993); *Braesch v. Union Ins. Co.,* 237 Neb. 44, 464 N.W.2d 769 (1991); *McCullough v. Golden Rule Ins. Co.,* 789 P.2d 855 (Wyo.1990); *Weems v. American Sec. Ins. Co.,* 486 So.2d 1222 (Miss. 1986); *Dailey v. Integon Gen. Ins. Co.,* 75 N.C.App. 387, 331 S.E.2d 148, *review denied,* 314 N.C. 664, 336 S.E.2d 399 (1985); *Gibson v. National Ben Franklin Ins. Co.,* 387 A.2d 220 (Me. 1978).

**11.** In *Dolan,* the Iowa Supreme Court set out the following reasons cited by other courts for adopting the first-party bad faith tort:

> "1. Without the tort, "an insurance company can arbitrarily deny coverage and delay payment of a claim" to its insured "with no more penalty than interest on the amount owed;"
>
> 2. Due to the "uneven bargaining power between an insured and its insurer, the insured needs the extra leverage the tort of bad faith would provide to even the positions;"
>
> 3. "Insurance contracts are contracts of adhesion;"
>
> 4. The bad faith tort "is justified because of the nature of the insurance industry, which is imbued with the public interest;"
>
> 5. An insured is often "suffering from physical injury or economic loss when bargaining with the insurance company" and hence "the vulnerable position justifies the additional remedy of a bad faith cause of action;"
>
> 6. "The recognition of the bad faith tort in third-party situations justifies its recognition in first-party situations;" and
>
> 7. "When an insured purchases insurance, she is purchasing more than financial security; she is purchasing peace of mind," and "there-

■ Under Iowa law, in order to establish a cause of action against an insurance carrier for bad faith conduct relating to a claim made by its insured, a plaintiff must first show the absence of a reasonable basis for denying benefits of the policy. *Wetherbee v. Economy Fire & Casualty Co.*, 508 N.W.2d 657, 661 (1993); *Dolan*, 431 N.W.2d at 794 (citing *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 691, 271 N.W.2d 368, 376 (1978)). In addition, plaintiff must show that defendant denied its insured's claim "knowing or having reason to know that its denial was without reasonable basis." *Wetherbee*, 508 N.W.2d at 661–62; *See Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 253 (Iowa 1991); *Kiner*, 463 N.W.2d at 13. "A reasonable basis to deny a claim exists when the claim is fairly debatable." [12] *Wetherbee*, 508 N.W.2d at 662; *See Reuter*, 469 N.W.2d at 254. Less than two months prior to the trial of this matter, the Iowa Supreme Court determined that: "[w]hether a claim is fairly debatable in any given situation is appropriately decided by the court as a matter of law." *Wetherbee*, 508 N.W.2d at 662.

fore, the extra remedy of bad faith is needed to insure she receives the benefit of her bargain." *Dolan*, 431 N.W.2d at 791 (quoting Phelan, *The First Party Dilemma: Bad Faith or Bad Business?*, 34 Drake L.Rev. 1031, 1035–36 (1985–86)) (citing *Spencer v. Aetna Life & Casualty Ins. Co.*, 227 Kan. 914, 917–19, 611 P.2d 149, 152–53 (1980)).

12. In *Dolan*, the Iowa Supreme Court adopted the "fairly debatable" standard that the Wisconsin Supreme Court first employed in *Anderson*, 85 Wis.2d 675, 271 N.W.2d at 376. *Dolan*, 431 N.W.2d at 794. In *Anderson*, the Wisconsin Supreme Court pointed out that in a prior decision, *Drake v. Milwaukee Mut. Ins. Co.*, 70 Wis.2d 977, 236 N.W.2d 204, 207 (1975), the court had not recognized a claim for bad faith because "it was not a case 'where the validity of the claim was not even fairly debatable.'" *Anderson*, 85 Wis.2d 675, 271 N.W.2d at 376 (quoting *Drake*, 70 Wis.2d at 984, 236 N.W.2d at 208). From this basis, the Wisconsin court went on to extrapolate that:

"It is thus apparent from *Drake* that when a claim is 'fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law."

*Id.*, 271 N.W.2d at 376.

13. However, the court believed the better practice was to submit the first party bad faith claim to the jury and address the issue in post trial

## 2. Was Chadima's Claim "Fairly Debatable" By National Fidelity?

Both in informal discussions with counsel during the jury trial and at the formal recorded instruction conference, pursuant to Federal Rule of Civil Procedure 51, counsel for the parties and the court engaged in extensive discussion about whether the court should decide as a matter of law whether Chadima's claim was "fairly debatable" by National Fidelity. At all times throughout this process, the court maintained the position that, based on the recently decided Iowa Supreme Court decision in *Wetherbee v. Economy Fire & Casualty Co.*, 508 N.W.2d 657, 661 (1993), the court should determine, as a matter of law, whether Chadima's claim was fairly debatable by National Fidelity. This created a dilemma for the trial court. If the court believed Chadima's claim was fairly debatable, then, under well established first-party bad faith principles of Iowa law, there could be no first-party bad faith and the claim should not be submitted to the jury.[13] If the claim was going to be submit-

motions. In *Dace v. ACF Indus., Inc.*, 722 F.2d 374 (8th Cir.1983), the Eighth Circuit noted:

This case illustrates again that it is usually better practice for a district court, faced with a motion for directed verdict, to allow the case to go to the jury and address the issue by way of judgment n.o.v. if necessary. The jury may find for the moving party, in which case the issue disappears. If the verdict is against the moving party and if judgment n.o.v. is granted, and if this Court decides on appeal that it should have been denied, the verdict can simply be reinstated and no new trial is necessary.

*Id.* at 379 n. 9; *see also Dale v. Janklow*, 828 F.2d 481, 484 (8th Cir.1987), *cert. denied*, 485 U.S. 1014, 108 S.Ct. 1486, 99 L.Ed.2d 714 (1988); *United States Philips Corp. v. Windmere Corp.*, 861 F.2d 695, 705 (Fed.Cir.1988), *cert. denied sub nom. North American Philips Corp. v. Windmere Corp.*, 490 U.S. 1068, 109 S.Ct. 2070, 104 L.Ed.2d 635 (1989); *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 166 n. 2 (2d Cir.1980). This was particularly true where, here, all of the trial witnesses were called in Chadima's case in chief and the Federal Rule of Civil Procedure 50 motions for judgment as a matter of law were made after all of the evidence was submitted. From a trial management prospective, this procedure made the most sense because the trial evidence had already been received by the jury. The only remaining portions of the trial were the final instructions and closing arguments.

ted to the jury, then the court believed it should instruct on the second element of first-party bad faith that there was no reasonable basis for denying the claim as a matter of law. Thus, the court proposed the following jury instruction no. 17:

## PROPOSED JURY INSTRUCTION NO. 17

### Bad Faith

Plaintiffs have alleged that Defendant should be held liable under the theory of bad faith. In order to establish bad faith on behalf of the Defendant, Plaintiffs must prove all of the following propositions:

1. The Defendant denied Plaintiffs' claim.

2. There was no reasonable basis for denying the claim. The court instructs you on this second proposition that, as a matter of law, there was no reasonable basis for denying the claim. In other words, this proposition has already been proven and established by the Plaintiffs.

3. The Defendant knew or had reason to know that there was no reasonable basis for denying the claim.

4. The denial was a proximate cause of damage to the Plaintiffs.

5. The nature and extent of damage.

If the Plaintiffs have failed to prove any of these propositions, the Plaintiffs are not entitled to these damages. If the Plaintiffs have proved propositions 1, 3, 4 and 5 (the court has already determined that the Plaintiffs proved proposition 2), then you should determine what damages, if any, the Plaintiffs are entitled to.

Counsel for both Chadima and National Fidelity objected to this instruction. Chadima's counsel asserted that the jury, as the trier of fact, should decide this element of the instruction. Counsel for National Fidelity argued that the court should decide, as a matter of law, that there was no first-party bad faith and, therefore, not submit the first-party bad faith theory to the jury. Failing that, counsel for National Fidelity argued that the court should not give proposed instruction no. 17, but, rather, should submit

the issue of whether there is a reasonable basis for denying the claim to the jury.

After lengthy discussion and analysis, both informally and at the formal Rule 51 instruction conference, the court reluctantly agreed to let the jury decide the second element of first-party bad faith—that is whether there was a reasonable basis for denying the claim—and to reserve final judgment on the question until post trial motions. Thus, the following jury instruction no. 17 was given by the court on the first-party bad faith issue:

## JURY INSTRUCTION NO. 17

### Bad Faith

Plaintiffs have alleged that Defendant should be held liable under the theory of bad faith. In order to establish bad faith on behalf of the Defendant, Plaintiffs must prove all of the following propositions:

1. The Defendant denied Plaintiffs' claim.

2. There was no reasonable basis for denying the claim.

3. The Defendant knew or had reason to know that there was no reasonable basis for denying the claim.

4. The denial was a proximate cause of damage to the Plaintiffs.

5. The nature and extent of damage.

If the Plaintiffs have failed to prove any of these propositions, the Plaintiffs are not entitled to these damages. If the Plaintiffs have proved all of these propositions, you must determine whether the Plaintiffs are entitled to damages and, if so, the amount.

Neither party objected to the giving of jury instruction no. 17. However, National Fidelity objected during the Rule 51 conference and in its Rule 50 motion for judgment as a matter of law, and in its post trial motions pursuant to Rules 50 and 59 that, as a matter of law, Chadima's claim was fairly debatable and the issue should not have been submitted to the jury.

In light of instruction no. 17 as actually given, the court has no problem concluding there was substantial evidence to support the jury's finding that there was no reasonable basis for denying the claim.[14] This is espe-

---

14. In this regard, if instruction no. 17 was correct (which the court does not believe it was

cially true in light of the standard required under Federal Rule of Civil Procedure 50 that the evidence be considered in the light most favorable to Chadima, assume the jury resolved all conflicts of evidence in favor of Chadima, assume as true all facts which Chadima's evidence tended to prove, and giving Chadima the benefit of all favorable inferences which may be reasonably drawn from the facts. *See Minneapolis Comm. Dev. Agency v. Lake Calhoun Assoc.*, 928 F.2d 299, 301 (8th Cir.1989) (citing *Atlas Pile Driving Co. v. Dicon Fin. Co.*, 886 F.2d 986, 989 (8th Cir.1989); *McAnally v. Gildersleeve*, 16 F.3d 1493, 1496 (8th Cir.1994). It would also be true under the Rule 59 standard for new trial. *Pence*, 961 F.2d at 780.

Thus, if the court correctly instructed the jury in instruction no. 17, the court would not set aside the verdict under Federal Rule of Civil Procedure 50 because the court believes there was substantial evidence to support the jury's finding that there was no reasonable basis for denying the claim.

■ On the other hand, if the Iowa Supreme Court meant what it said in *Wetherbee* that "[w]hether a claim is fairly debatable in any given situation is appropriately decided by the court as a matter of law", *Wetherbee*, 508 N.W.2d at 662, the court must conclude that Chadima's claim was fairly debatable by National Fidelity. Notwithstanding the court's view that there is substantial evidence for the jury to conclude that there was no reasonable basis for denying the claim, the court's understanding of the evidence compels the conclusion that the claim was fairly debatable as a matter of law. It is true that the initial claims examiner, Catherine Bicknell White, concluded Chadima was entitled to the greater amount under the original policy. However, under the court's view of the evidence, there was a reasonable basis for Ms. Perrine and Mr. Burkett to disagree with that initial assessment. Moreover, once Ms. White heard Ms. Perrine's rationale she agreed with it. Admittedly, the company's computer records and written records were at odds with each other concerning the validity of the original policy. National Fidelity was, however, entitled to fairly debate the merits of Chadima's claim. Neither Ms. Perrine nor Mr. Burkett had faced this specific situation before and, thus, there was no clear company policy or precedent (legally or factually) to immediately and definitively resolve their questions. National Fidelity even had, as it urged in its post trial brief, "a right to be wrong in this case...." [15] Chadima strongly argues in its brief that *Wetherbee* either really doesn't mean what it says or, in the alternative, is distinguishable from this case on the question of whether the court should determine that the claim was fairly debatable as a matter of law. Chadima argues as follows in its brief:

> This case is in stark contrast to the situation in *Wetherbee v. Economy Fire & Casualty Co.*, 508 N.W.2d 657 (Iowa 1993) which is relied upon by Defendant. In *Wetherbee*, two *legal* issues were involved. The first involved the question of whether an insured was entitled to recover underinsurance motorist benefits from her insurance company when she had no right to bring the action in her own name against the company and the time for opening an estate had expired. The second involved the question of whether Plaintiff could establish bodily injury under the policy. A review of the Court's opinion shows the factual issues were not contested, but the legal effect of the stipulated facts was at issue. Consequently, the Court summarily dismissed the bad faith claim. In this case, Defendant has raised no legal questions as to its obligation to pay under the policy. Rather what is involved is a question of *fact* as to the reasonableness of their actions given their knowledge at the

because of the language in the *Wetherbee* case that "whether a claim is fairly debatable in any given situation is appropriately decided by the court as a matter of law", *Wetherbee*, 508 N.W.2d at 662) the court believes a jury verdict either for or against Chadima would have been supported by substantial evidence. That is because the evidence produced at trial was substantial on both sides of the question of whether there was a

reasonable basis for denying the claim and, therefore, whether the claim was fairly debatable.

**15.** Def. Brief in Support of Renewed Motion for Judgment as a Matter of Law or, in the Alternative, For New Trial, filed Feb. 4, 1994, p. 4.

time the claim was denied. This matter was resolved by the jury against the Defendant and that verdict must stand since it is supported by substantial evidence. E.g. *Nassen v. National States Ins. Co.*, 494 N.W.2d 231, 236 (Iowa 1992); *Kiner v. Reliance Ins. Co.*, 463 N.W.2d 9, 12 (Iowa 1990).[3]

---

[3] The language relied upon by Defendant from *Wetherbee* is, at best, dicta. Reviewing the case in its entirety it is clear that the dispute in *Wetherbee* was the legal conclusion to be drawn from the stipulated facts, i.e., whether Plaintiff could assert a consortium claim (which had to be asserted by the estate) when the time for opening the estate had expired. Since there was no *factual* dispute, it was appropriate for the district court to summarily decide the matter. However, where there *is* a factual dispute, it is still the law of this state that a jury should properly decide the matter.

Further evidence that the language is dicta is the fact that the *Wetherbee* court made no effort to explain its radical and abrupt departure from *Nassen* and *Kiner* and its earlier decisions. It is inconceivable that the Supreme Court would give such cursory treatment to such an extreme change of position.

Pl. Resistance to Def. Post Trial Motions, filed Mar. 9, 1994, pp. 12–13, n. 3.

16. Chadima could have but did not ask this court to certify the question of the proper interpretation of the statement in *Wetherbee* about the court determining the fairly debatable standard as a matter of law to the Iowa Supreme Court. *See* Local Court Rule 23 entitled "Certified Question of Law" and Iowa Code ch. 684A entitled "Questions of Law in Supreme Court Certified".

17. There is some merit in Chadima's challenge to the language in *Wetherbee* that "[w]hether a claim is fairly debatable in a given situation is appropriately decided by the court as a matter of law." *Wetherbee*, 508 N.W.2d at 662. "As with most meritorious issues, there is an element of truth in each of the parties' conflicting contentions." *Smith v. Printup*, 866 P.2d 985, 992 (Kan.1993). This court is troubled by the fact that there is no explanation in *Wetherbee* as to why the court should decide the fairly debatable question as a matter of law. After all, whether a claim is fairly debatable depends upon whether there is a reasonable basis to deny the claim. *Wetherbee*, 508 N.W.2d at 662; *Reuter*, 469 N.W.2d at 254. This court does not understand why determining reasonableness in the context of a first-party bad faith cause of action is for the court yet determining reasonableness in the context of whether a person is negligent is for the trier of fact. *See* Iowa Uniform Civil Jury In-

Notwithstanding Chadima's interpretation of the *Wetherbee* decision,[16] this court believes it must apply its plain and clear meaning.[17] That is, that the court must decide as a matter of law whether the underlying claim was fairly debatable and that it is impermissible to submit that question to the jury. The court finds that the trial evidence supports National Fidelity's position that Chadima's claim was fairly debatable and, therefore, grants National Fidelity's Rule 50 motion.[18] This determination that Chadima's claim was fairly debatable by National Fidelity renders moot Chadima's motion for entry of judgment on the punitive damage question as well as the State of Iowa's motion for judgment entry.[19]

### D. National Fidelity's Challenge to Chadima's Recovery Under Breach of Contract

National Fidelity argues that "[t]here has been no evidence presented as to the terms of the contract, and there has been no evidence that any of the terms of the contract were even [sic] breached." [20] Again, in order to resolve National Fidelity's argument, a basic overview of Iowa contract law is necessary.

struction 700.2 where "negligence" is defined as "something a reasonably careful person would not do under similar circumstances...."

18. It would be inappropriate to grant National Fidelity's Rule 59 motion. A new trial is not required because the court has ruled that as a matter of law under Rule 50, Chadima's claim to National Fidelity was fairly debatable and, therefore, there can be no first party bad faith.

19. Chadima argued both in the Rule 51 instruction conference and in its Rule 50 motion at trial and post trial that there was no evidence in the record supporting the jury's answer to the special interrogatory that the conduct of National Fidelity was not directed specifically at Chadima. Because the granting of National Fidelity's trial and post trial motions on the question of first party bad faith renders the punitive damages questions moot, the court need not enter and decide the most interesting and very close question of whether the jury properly answered the special punitive damage interrogatory.

20. Def. Brief in Support of Its Renewed Motion for Judgment as a Matter of Law, or in the Alternative, For New Trial, filed Feb. 4, 1994, p. 10.

"In a breach of contract claim, the complaining party must prove 1) the existence of a contract, 2) the terms and conditions of the contract, 3) that it has performed all of the terms and conditions required under the contract, 4) the defendant's breach of the contract in some particular way, and 5) that plaintiff has suffered damages as a result of the breach." *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch,* 497 N.W.2d 821, 825 (Iowa 1993) (citing *Berryhill v. Hatt,* 428 N.W.2d 647, 652 (Iowa 1988)).

■ Under Iowa law, "[t]he essential elements of a contract include communication of an offer and acceptance in a manner specified or required by law." *Desy v. Rhue,* 462 N.W.2d 742, 746 (Iowa Ct.App.1990). In order for a contract to be binding, it must be definite and certain as to its terms to enable the court to give it an exact meaning. *Gildea v. Kapenis,* 402 N.W.2d 457, 459 (Iowa Ct.App.1987); *see Palmer v. Albert,* 310 N.W.2d 169, 172 (Iowa 1981); *Davis v. Davis,* 261 Iowa 992, 1001, 156 N.W.2d 870, 876 (1968).

"It is the cardinal principle of contract construction that the parties' intent controls; and except in cases of ambiguity, this is determined by what the contract itself says." *Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents,* 471 N.W.2d 859, 862 (Iowa 1991). As the Iowa Supreme Court pointed out in *Black & Veatch* :

The construction of a contract, the legal effect of the contract, is always a matter for the court. *Connie's Constr. v. Fireman's Funds Ins.,* 227 N.W.2d 207, 210 (Iowa 1975). Interpretation, the meaning of contractual words, is also an issue for the court unless it is dependent upon extrinsic evidence or upon a choice among reasonable inferences from the extrinsic evidence. *Id.* Extrinsic evidence is admissible as an aid to interpretation when it throws light on the parties' situation, antecedent negotiations, the attendant circumstances, and the objectives the parties were trying to attain. *Taylor Enter., Inc. v. Clarinda Prod. Credit Ass'n,* 447 N.W.2d 113, 115 (Iowa 1989). Generally,

questions of performance or breach are for the jury. *Id.* at 116.

*Black & Veatch,* 497 N.W.2d at 825.

■ In *Wickham & Burton Coal Co. v. Farmers Lumber Co.,* 189 Iowa 1183, 1185, 179 N.W. 417, 418 (1920), the Iowa Supreme Court declared that: "[W]hatsoever is ascertainable with reasonable effort is sufficiently certain to be enforced ..." In *Severson v. Elberon Elevator, Inc.,* 250 N.W.2d 417, 420 (Iowa 1977), the court went on to declare that: "(Contract) terms are sufficiently definite if the court can determine with reasonable certainty the duty of each party and the conditions relative to performance." Courts should be slow to hold a contract unenforceable for uncertainty and must take every effort to avoid such a result. *Palmer v. Albert,* 310 N.W.2d 169, 172 (Iowa 1981). In interpreting the meaning of contracts, courts seek "to give effect to the intention of the parties in conformity with a reasonable application of the circumstances under which the instrument was executed." *First Nat'l Bank in Creston v. Smith,* 331 N.W.2d 120, 122 (Iowa 1983); *see Miller v. Geerlings,* 256 Iowa 569, 576–77, 128 N.W.2d 207, 213 (1964); *Darnall v. Day,* 240 Iowa 665, 670–71, 37 N.W.2d 277, 280 (1949).

■ " 'Under Iowa law, when a contract has been breached, the innocent party is generally entitled to be placed in a position he would have occupied had there been performance.' " *Metropolitan Transfer Station, Inc. v. Design Structures, Inc.,* 328 N.W.2d 532, 535 (Iowa Ct.App.1982) (quoting *Lakota Girl Scout Council, Inc. v. Havey Fund–Raising Management, Inc.,* 519 F.2d 634, 639–40 (8th Cir.1975)). An important corollary to the general rule is that a party seeking damages for a breach of contract has a duty to mitigate its damages. *DeWaay v. Muhr,* 160 N.W.2d 454, 456 (Iowa 1968). The defense of mitigation, however, must be both pled and proven by the asserting party. *Iowa Power & Light Co. v. Board of Water Works Trustees,* 281 N.W.2d 827, 833 (Iowa Ct.App.1979). The defense of failure to mitigate damages precludes an award of those damages which plaintiff could have been avoided by taking "reasonable efforts." *See Welter v. Humboldt County,* 461 N.W.2d 335,

340 (Iowa Ct.App.1990); *Shewry v. Heuer,* 255 Iowa 147, 154, 121 N.W.2d 529, 533 (1963).[21]

 The court notes that neither Chadima nor National Fidelity introduced the actual insurance contract into evidence. Nonetheless, the court believes there was sufficient evidence to support the jury's verdict on the breach of contract claim. The jury could have found that National Fidelity did not pay the amount due under the original insurance contract within a reasonable period of time. Also, the jury could have found under the trial evidence that National Fidelity failed to tender to the Plaintiffs additional interest due from the time the checks were issued until National Fidelity instructed the Plaintiffs that they could cross out the release language. Moreover, the jury could have found under the evidence that National Fidelity failed to carry its burden of persuasion on their affirmative defense of mitigation. While the court would have found, sitting as a trier of fact, that the Plaintiffs failed to mitigate damages by failing to cash the checks after having been given oral permission to do so, the court is unwilling to substitute its own judgment for that of the jury. The jurors heard both sides of the evidence on the question of mitigation and found for the Plaintiffs.[22]

Because there is substantial evidence to support the jury's verdict for Chadima on the breach of contract claim, National Fidelity's Rules 50 and 59 motions are denied.

### VI. CONCLUSION.

The jury's verdict that National Fidelity committed first-party bad faith in its han-
dling of Chadima's insurance claims must be set aside because, as a matter of law, Chadima's claim was fairly debatable by National Fidelity. Because the $100,000.00 in punitive damages was awarded on Chadima's first-party bad faith claim, the judgment entered on January 24, 1994 is modified to delete the $100,000.00 punitive damage award. Thus, the State of Iowa's potential interest in 75 percent of the punitive damage award, authorized by Iowa Code § 668A.1(2)(b), is moot. Likewise, Chadima's trial and post trial motions seeking to overturn the jury's special interrogatory finding that National Fidelity's conduct was not directed specifically at Chadima is also moot.

The court rejects National Fidelity's argument that there was insufficient evidence to support the jury's award of $34,029.00 in compensatory damages. Therefore, National Fidelity's trial and post trial motions seeking to overturn the jury's breach of contract award are denied. The judgment entered on January 24, 1994 in the amount of $34,029.00 in compensatory damages is affirmed.

One final point. This case was exceptionally well prepared, tried before the jury, and briefed and argued on post trial motions by Kevin H. Collins for Chadima and Thomas J. Shields for National Fidelity. The same is true of Iowa Assistant Attorney General Richard E. Mull's handling of the State of Iowa's intervention and interest in the punitive damage award. While this case was zealously litigated by counsel, they, at all times, displayed the utmost professionalism

---

21. The court instructed the jury in this case on National Fidelity's affirmative defense of mitigation as follows:

 **JURY INSTRUCTION NO. 26**
 *Mitigation of Damages*
 You are instructed that any person who claims damages as a result of an alleged wrongful act on the part of another has a duty under the law to "mitigate" those damages— that is, to take advantage of any reasonable opportunity they may have had under the circumstances to reduce or minimize the loss or damage.
 So, if you should find that the Defendant has proved by a preponderance of the evidence that the Plaintiffs have failed to seek out or take advantage of an opportunity that was rea-
sonably available to them under all of the circumstances shown by the evidence, then you should reduce the amount of their damages by the amount they could have reasonably realized if they had taken advantage of said opportunity.

22. One might fairly inquire why the court is unwilling to substitute its own judgment for that of the jury on the question of mitigation but was willing to do so on the question of first party bad faith. The answer to this apparent contradiction is simple. The court understands the *Wetherbee* decision to compel the trial judge to make the decision of whether Plaintiffs' claim is fairly debatable as a matter of law.

and are commended by the court for their exemplary handling of this litigation.

**IT IS SO ORDERED.**